WILLIAM J. GRILL et al., Appellants, *v.* CITY OF NEW YORK, Respondent.

472

Argued March 14, 1940; decided April 16, 1940.

*Leonard G. Bisco, David Barnett* and *Herbert E. Mayer* for appellants. The Commissioner of Public Markets of the City of New York had the power and authority to include in the 1929 lease the city's covenant to pay for the lessee's building. (*Crater's Wharf, Inc.,* v. *Valvoline Oil Co.,* 196 N. Y. Supp. 815; *Howe's Cave Assn.* v. *Houck,* 66 Hun, 205; 141 N. Y. 606; *Precht* v. *Howard,* 197 N. Y. 136; *Lewis* v. *Ocean Navigation & Pier Co.,* 125 N. Y. 341; *Seaboard Air-line Ry.* v. *North Carolina,* 245 U. S. 298; *Hinrichs, Inc.,* v. *City of New York,* 121 Misc. Rep. 592; 212 App. Div. 816; 242 N. Y. 527; *Lloyd* v. *Mayor,* 5 N. Y. 369; *Matter of City of New York* [*Lands on North Shore of Harlem River*], 127 Misc. Rep. 710; *People ex rel. Fleming* v. *Dalton,* 158 N. Y. 175; *Peterson* v. *Martino,* 210 N. Y. 412; *Hamilton* v. *Erie R. R. Co.,* 219 N. Y. 343; 248 U. S. 369; *Matter of Marcellus,* 165 N. Y. 70; *McGovern* v. *City of New York,* 234 N. Y. 377; *Beers* v. *Hotchkiss,* 256 N. Y. 41; *People* v. *Cook,* 11 Barb. 259; 8 N. Y. 67; *Grimmer* v. *Tenement House Department,* 205 N. Y. 549; *Matter of City of New York* [*Willard Parker Hospital*], 217 N. Y. 1.) The trial court erred in construing the lease to mean that the lessee would be deprived of his building without compensation if he failed to exercise his renewal option. (*Daniel Holding Corp.* v. *234 West 42nd Street Corp.,* 255 App. Div. 8; *Pittsburgh & Shawmut R. R. Co.* v. *Central Trust Co.,* 156 App. Div. 182; *Employers' Liability Assur. Corp.* v. *Morrow,* 143 Fed. Rep. 750; *Marshall* v. *Commercial*

*Travelers' Mut. Acc. Assn.*, 170 N. Y. 434; *Matter of Brooklyn Trust Co.* [*Prudence-Bonds Corp.*], 163 Misc. Rep. 117; *Gillet* v. *Bank of America*, 160 N. Y. 549; *Eighteenth St. Realty Corp.* v. *Maxthan Realty Co.*, 233 App. Div. 687; *Columbus Spa, Inc.*, v. *Star Co.*, 216 App. Div. 218; *Foreman* v. *Elaine Realty Corp.*, 240 App. Div. 490.)

*Manuel Maxwell* and *Arthur I. Meyer* for Frederick H. Vahlsing et al., *amici curiæ*. Chapter 569 of the Laws of 1894, as amended, ceased to govern leases between the predecessor of the plaintiff Grill, and the defendant in 1909. (1 Sutherland on Statutory Construction [2d ed.], § 254; *Matter of W. S. A. & P. R. R. Co.*, 115 N. Y. 442; *City of New York* v. *Maltbie*, 274 N. Y. 90; *City of New York* v. *New York City Ry. Co.*, 193 N. Y. 543; *Grimmer* v. *Tenement House Department*, 205 N. Y. 549; *Matter of City of New York* [*Willard Parker Hospital*], 217 N. Y. 1; *Hamilton* v. *Erie R. R. Co.*, 219 N. Y. 343; *McGovern* v. *City of New York*, 234 N. Y. 377; *Beers* v. *Hotchkiss*, 256 N. Y. 41.)

*William C. Chanler*, Corporation Counsel (*Julius Isaacs, Joseph F. Mulqueen, Jr., Reuben Levy* and *William A. Marks* of counsel), for respondent. Condition eight which obligates the city to pay for the building under certain conditions was in the Grill lease by express requirement of the earlier statutes. Since these statutes expressly forbade terms inconsistent with them, the tenth paragraph, on which the appellants rely, must be a nullity if repugnant to condition eight. (*McDonald* v. *Mayor*, 68 N. Y. 23; *Bonesteel* v. *City of New York*, 22 N. Y. 162; *Bird* v. *Grout*, 106 App. Div. 159; *Rowehl* v. *City of New York*, 236 App. Div. 852; *Matter of Smith* v. *Morgan*, 253 App. Div. 239; *Matter of Smith* v. *Morgan*, 167 Misc. Rep. 815; 254 App. Div. 672; *Hinrichs, Inc.*, v. *City of New York*, 121 Misc. Rep. 592; 212 App. Div. 816; 242 N. Y. 527; *Trustees of Columbia University* v. *Kalvin*, 250 N. Y. 469.) The only obligation of the city to pay for the building is the one prescribed in condition eight of the Grill lease. (*Talbot*

v. *Cruger*, 151 N. Y. 117; *Loughran* v. *Ross*, 45 N. Y. 792; *Burns* v. *City of New York*, 213 N. Y. 516; *Zorkowski* v. *Astor*, 156 N. Y. 393; *348 Madison Avenue Corp.* v. *Marshall*, 212 App. Div. 672; 241 N. Y. 520.)

RIPPEY, J.   Plaintiff Grill was the lessee of Lot 322 of Wallabout Market, borough of Brooklyn, and the owner of the building thereon.   The Manufacturers Trust Company held a mortgage on the building.   Defendant is the owner of the land.   This action was commenced on October 31, 1938, to secure a judgment declaratory of the rights and obligations of the parties under a written lease dated May 1, 1929, and expiring May 1, 1939.   Defendant asked for a dismissal of the complaint and counterclaimed for a judgment canceling the lease for non-payment of rent, compelling the lessee to vacate and for damages for withholding possession.   After a trial, defendant's counterclaim was dismissed. It was the claim of plaintiffs that defendant could not require them to renew the lease and that the buildings on the premises would revert to the city of New York on the expiration of the lease upon payment by the city of the then value of the buildings to be fixed as provided by the provisions of the lease, which sum the defendant should be compelled to pay.   The judgment of the trial court was that the city was required neither to grant a renewal of the lease nor to pay the value of the buildings on the premises unless the tenant, within the time specified in the lease, served a notice of his election to renew, in which event the city must renew the lease or pay to the tenant the value of the buildings on the premises.   The Appellate Division affirmed by a divided court.

The lease in question was executed and delivered to one Isaac Sunshine by the city of New York, acting by and through the Commissioner of the Department of Public Markets of the City of New York, under the authority, as expressly stated in the lease, conferred on him by section 261 of article 22 of the Farms and Markets Law (now known as the Agriculture and Markets Law [Cons. Laws, ch. 69])

and by section 30 of article 2 of chapter 15 of the Code of Ordinances of the City of New York. The ground rent was fixed at $380 per year, payable in equal monthly installments in advance. The lease was a renewal of a previous lease dated May 1, 1919, which gave the tenant an option to renew for the additional term of ten years at a rental to be fixed by the Commissioner and the tenant, or by a commission if those parties could not agree, " without regard to any building erected upon said premises in all cases where the same is not owned by the city," at not less than an amount equal to two-thirds of the rent of the preceding term nor in excess of an amount equal to one and one-third times such rent. Thus the rental as fixed was " ground rent " only, it being conceded and found that the building on the land was the property of the tenant. It had been built in 1896 by a tenant under a somewhat similar lease and title had passed by conveyances to Sunshine through earlier tenant owners. As further consideration for the lease, the tenant was required to pay all taxes and water rents imposed on the premises by the city. The lease contained an option to the tenant to renew for an additional period of ten years to be exercised by giving to the landlord at least six months' written notice previous to May 1, 1939, of his desire to exercise the option. There are many provisions of the lease, inserted by the city and not required or authorized in express terms by any provision of law, not here important. The clauses which are up for construction will be numbered 1, 2 and 3 for convenient reference and read as follows:

1. " And the party of the first part further covenants and agrees that the buildings erected on the premises herein demised shall upon the expiration or sooner termination of the within lease, or, if renewed, upon the expiration of said renewal term, revert to and become the property of the City of New York upon payment to the Lessee or his successor or assigns of the then value of the buildings built as hereinbefore provided, such value to be fixed and determined as agreed upon by and between the Commissioner of the Department of Public Markets of The City of New York,

and the said party of the second part, his successors and assigns, not less than four months prior to the expiration of said lease or of the renewal thereof, if renewed, and in the event that no such agreement can be reached by the said Commissioner and the said party of the second part four months prior to and preceding the expiration of said lease or of the renewal term thereof, then such value shall be ascertained by three disinterested Commissioners to be nominated and appointed by a Justice of the Supreme Court on the application of the Commissioner of Public Markets of the City of New York on ten days' notice to the party of the second part, his successors, or assigns. The findings of the Commissioners so appointed as aforesaid as to the value of such building or buildings shall be final and conclusive upon all parties and the expense of such Commissioners shall be paid and borne one-half by the City and one-half by the party of the second part, but it is mutually agreed that the party of the first part shall not be obligated to pay to the party of the second part, his legal representatives or assigns the value of the said buildings if the party of the second part has surrendered this lease or failed to pay the rent as herein provided."

2. " 7. That if at any time before the expiration of the term aforesaid, the said party of the second part, his legal representatives or assigns shall surrender this lease or fail to pay the rent of the said premises after the same becomes due and payable on the dates and at the times hereinbefore specified, or shall refuse or neglect to renew this lease at the rent which shall be fixed and determined for such renewal, then and in that event the buildings erected on the said premises shall revert to and belong to The City of New York without the payment of any compensation therefor to the party of the second part, his legal representatives or assigns, for the said buildings."

3. " 8. That at the final expiration of the term of this lease and of the renewal thereof herein provided for and of any other renewals which may be at any time made, the said The City of New York shall, at its option, to be exer-

cised by the Commissioner of the Department of Public Markets, either grant further renewals thereof at rents to be fixed as herein provided for, or pay unto the said party of the second part, his legal representatives or assigns, the value at that time of the buildings built as aforesaid upon the said premises, which value, if not fixed, determined and agreed upon by and between the said Commissioner of the Department of Public Markets and the party of the second part, shall be ascertained by three disinterested Commissioners to be appointed as herein provided for the fixing of rents."

Clause numbered 1 above requires the city to pay for the building at the termination of the lease a sum fixed according to the provisions therein contained except upon voluntary surrender by the tenant before the expiration of the term or by virtue of his default in the payment of rent. Clause numbered 2 above as clearly and unequivocally provides for reverter of the building to the city without cost on the same conditions of voluntary surrender or failure to pay rent. It also contains the clause that the same result will obtain when the tenant " shall refuse or neglect to renew this lease at the rent which shall be fixed and determined for such renewal." Under another clause of the lease, briefly referred to above, the tenant " shall have the option of a renewal of this lease for an additional term of ten years from the first day of May Nineteen Hundred Thirty-nine by giving at least six months' notice in writing prior to the expiration of the existing term of his election so to renew." The same clause then provides that the rent for the renewal term shall be fixed, determined and agreed upon between the parties but, if not agreed upon prior to January 1, 1939, " then the rent for such renewal term shall, if either the Commissioner or the Lessee or holder so elects, be fixed and ascertained by three disinterested Commissioners, to be nominated and appointed by a Justice of the Supreme Court upon the application of the Commissioner of Public Markets, on ten days' notice of such application to the Lessee of said premises, or his successors or assigns." This clause simply

provides (1) for the privilege to the tenant to elect to renew to be exercised at least six months before the expiration date of the lease, (2) a determination by the parties, if possible, of the rent to be paid prior to the January first preceding the termination date, (3) a determination by Commissioners, if the parties cannot so agree, but *only if " the Commissioner or the Lessee or holder so elects,"* of the rent to be paid for the renewal term, and after those steps have been taken and the rents fixed (4) for the *actual renewal* of the lease. The distinction is clear between election to renew and actual renewal. Unless the rent is fixed, there can be no actual renewal. There is nothing, however, in the lease that gives the city any right to require the tenant to elect to renew. The option to make that election is conferred only on the tenant. That clause becomes important only in the event that the tenant indicates his purpose to take advantage of the option by a notice of election to renew and subsequently refuses or neglects to enter into the renewal lease after the rent and terms have been agreed to. Giving it that effect fits in with other clauses of the lease. Thus the expression " shall refuse or neglect to renew this lease at the rent which shall be fixed and determined for such renewal " refers to a neglect or refusal *actually to renew* after the tenant (1) has indicated his election to renew and (2) all preliminary steps in fixing rent for the new term have been taken. The court has found that the tenant, by letter dated October 3, 1938, and the mortgagee, by letter dated October 4, 1938, notified the Commissioner that they respectively did not desire to exercise the option to renew the lease, that there was no voluntary surrender of the lease by the tenant and that defendant had duly waived in writing and by its conduct the default in the failure to pay rent due on October 1, 1938 (all previous rents having been paid when due), that defendant had refused to accept a valid tender thereof and that defendant could not, for those reasons and others, assert any default on the part of the tenant in the refusal to pay rent. Thus neither clause 1 nor clause 2 furnishes any ground for defendant to assert that it may be relieved from

payment for the building as provided in clause 1. Clause 3 above, with similar clarity, relieves the city from its obligations under clause 1 only in the event that it grants a renewal at the rents previously fixed as provided for in the lease after election by the tenant to renew.

After receipt of notices from plaintiffs that they did not desire to exercise their option to renew the lease, on October 11, 1938, the Commissioner wrote to plaintiffs that the city stood "ready to renew this lease under clause 8 thereof" (clause numbered 3 above), and that, through failure or neglect of the plaintiffs to renew under clause 7 (numbered 2 above), the building would revert to and become the property of the city without cost to it. Again, attention is called to the fact that the city had no right under any provision of the lease to compel the tenant to elect to renew the lease. Obviously, it was not the intent of the parties nor the legal effect of the contract, in the absence of a provision reserving to the city any such legal right and in the face of the provision giving the tenant only the right to exercise such an option, to permit the city to nullify the provisions of clause 1 above by the simple expedient of asserting, when convenient, that it elected to compel the tenant to exercise his exclusive option.

Reading the lease as a whole and giving meaning to the three clauses and to every other pertinent clause of the lease, it seems clear that the city was required to pay for the building on the property in accordance with and under the conditions stated in clause above numbered 1 at the termination of the lease unless (1) there was an earlier voluntary surrender of the leasehold by the tenant, (2) the tenant defaulted in payment of rent reserved, of which default the lessor was entitled to take advantage, or (3) the tenant refused and neglected actually to renew the lease after he had previously exercised his option to renew and the rental had been fixed for the renewal term and the lessor had then consented to such renewal. By no other construction can the intent, purpose and undertakings of the parties and every clause and provision of the lease be given effect. Clause 1

above is not inconsistent with the provisions of clauses 2 and 3 above numbered and is not prohibited by any statutory provision relative to leasing as presently will be pointed out.

Defendant challenges the power of the city to make the agreement embodied in clause numbered 1 above and bases its challenge upon the *limited* powers granted to the Mayor and to the Commissioner of City Works of the City of Brooklyn, prior to its consolidation with the city of New York in 1897 (L. 1897, ch. 378), with reference to leases on the lots embraced in Wallabout Market (L. 1890, ch. 446; L. 1892, ch. 319; L. 1894, ch. 569; L. 1896, ch. 859; L. 1897, ch. 529) and upon the assertion that the Comptroller of the Greater City was granted no greater power under later acts.

The Wallabout Market plot was acquired by the city of Brooklyn from the United States Government. It was divided into lots and parcels in 1897. Authority to lease the lots was granted to the Commissioner of City Works, with the consent of the Mayor, but only within the strict terms of the statute. Little or no discretion was left to the officials as to the terms and provisions of the leases except as to the amount of rental to be imposed. It was provided that the first lease granted must expire on May 1, 1899, and that two renewals, each of five years, might be granted to the tenant but all leases and renewals must expire on May 1, 1909, at the latest. There was no authority to grant an option for any renewal at or after that date. No authority was given to the Commissioner to agree that the city should pay the tenant for the buildings erected by him on the lot leased except in the case referred to in clause numbered 3 above. The acts provided that such building should revert to the city without cost to it under the conditions mentioned in clauses numbered 2 and 3 above. Accordingly, the Commissioner leased lot 322 to one Benne on December 27, 1895, by lease expiring May 1, 1899, which was renewed for two terms of five years each, the last renewal expiring on May 1, 1909, at an annual rental for land only, without reference to the building which was erected on the

lot by Benne, at his own expense, in 1896. In each case
the lease and renewals contained clauses numbered 2 and 3
above substantially in the words of the statute (L. 1894,
ch. 569) or their equivalent but did not include clause
numbered 1. Prior to May 1, 1909, Isaac Sunshine had
duly become the owner of the Benne lease and had succeeded
to the ownership of the building on the premises, prior to
which date nothing had occurred by which the building had
reverted to or become the property of the city.

After the Consolidation Act and the enactment of the
Greater New York Charter (L. 1897, ch. 378), the Legis-
lature in 1901 (L. 1901, ch. 466) added section 164 to the
charter whereby the sole control and management of the
Wallabout Market lands were vested in the Department of
Finance of the City of New York. The Comptroller was
given broad power with reference to the terms of each lease.
Such powers not only included whatever power the Com-
missioner of City Works had under the earlier acts, but, in
addition, the Department of Finance and the Comp-
troller severally were given the sole and exclusive charge,
control and management of the market lands, "power
to make suitable regulations concerning fees, the hours
during which the said business shall be conducted"
and "*the sole power to lease any portion of the said market
lands and renew existing leases on such terms and at such
rentals as may be agreed upon between him and the lessees or
holders.*" (Italics ours.) Concerning rental to be paid
after the expiration of any existing lease, it was provided
that the rent should be fixed in the manner provided in
existing law *only in the event* that the amount should not be
agreed upon by the January first preceding the expiration of
the lease and either the Comptroller or the lessee should so
elect. In either event, the act fixed the minimum and maxi-
mum rent to be exacted. By the express terms of section
164 the Comptroller had power not only to lease in the
manner agreed to between the lessee and himself, subject
only as to the amount of rental, but could, with the consent
of the lessee, vary or modify the terms of any such lease and
could adjust and settle all claims and controversies apper-

taining to or arising out of any such lease or extension. He was affirmatively granted larger and different powers than those granted to the Commissioner of City Works and the act (§ 164) completely but differently and more broadly covers the powers granted to that official. There was no limitation, to be considered here, of the broad and complete power of the Comptroller to negotiate for and execute the new lease to Sunshine on May 1, 1909, containing clause numbered 1 above, to the terms of which the parties agreed, prepared and executed, as the lease itself states, under the authority of charter section 164.

If and to the extent that the powers conferred on the Comptroller by charter section 164 were inconsistent with the provisions of the earlier acts, that statute controls and its provisions must be given full force and effect. Otherwise the will of the Legislature would be ineffective. Under such circumstances, though not by express words repealed, the statutes relating to the leasing of Wallabout Market lots in force prior to the enactment of section 164 of the Greater New York Charter as contained in chapter 466 of the Laws of 1901, except as therein expressly saved, were by implication necessarily repealed (Book 1, McKinney's Consolidated Laws of New York, § 178; 1 Sutherland on Statutory Construction [2d ed. by Lewis], § 254 [145]; *Heckmann* v. *Pinkney*, 81 N. Y. 211; *Matter of Washington Street Asylum & Park R. R. Co.*, 115 N. Y. 442; *People ex rel. Bronx Parkway Comm.* v. *Common Council*, 229 N. Y. 1).

At the time the lease in suit was negotiated and executed, being a renewal of the lease of May 1, 1919, which, in turn, was a renewal of the lease of May 1, 1909, supervision and control of Wallabout Market were vested in the Commissioner of the Department of Public Markets of the City of New York, whose powers were as broad and unlimited as were those of the Comptroller under section 164 in the matter of maintenance and management of the property and in the matter of " fixing fees for services, licenses and privileges and of renting space therein and entering into leases therefor " (Laws 1917, ch. 802, § 72, now Agriculture

and Markets Law, § 261, subds. 1, 2; Code of Ordinances of the City of New York, ch. 15, art. 1, § 1, and art. 2, § 30), and in the matter of inserting in such leases such terms and conditions as might be agreed upon between himself and the tenant which were suitable and proper for the purposes at hand. Attention has already been called to the fact that the lease provided for ground rent only. It was fixed without considering the improvements made by the lessee. The amount was fair and within the maximum and minimum amounts specified by law. Over a period of forty-five years the improvements brought revenue to the city in the form of taxes. When section 164 of the charter and the act and ordinances under the authority of which the lease was executed were enacted, the facts as to the leasing of market lots and the ownership of buildings thereon were open and notorious. The provision in question was reasonable and not unusual and was suitable to the conditions at hand. Under all applicable statutes power was given to prescribe reasonable terms and conditions *in addition to* those in specific terms authorized if not inconsistent with their provisions. We conclude that it was not beyond the power of the Commissioner to include in the lease clause numbered 1 above.

The judgments of the Appellate Division and of the Special Term, in so far as appealed from, should be reversed, with costs to appellants in all courts, and the action remitted to the Special Term to enter a judgment in accordance with this opinion.

LEHMAN, Ch. J., LOUGHRAN, FINCH, SEARS, LEWIS and CONWAY, JJ., concur.

Judgment accordingly.