**BROOKLYN EASTERN DIST. TERMINAL v. CITY OF NEW YORK.**

No. 140.

Circuit Court of Appeals, Second Circuit.

Jan. 6, 1944.

See, also, Id., D.C., 42 F.Supp. 746.

Henry Herz, of New York City (Parsons, Closson & McIlvaine, William M. Sperry, 2d, Clinton T. Roe, and Charles P. Kramer, all of New York City, on the brief), for petitioner-appellant.

Leo Brown, of New York City (Ignatius M. Wilkinson, Corp. Counsel, Julius Isaacs, Louis M. Weintraub, and Benjamin Offner, all of New York City, on the brief), for respondent-appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal raises the question whether Brooklyn Eastern District Terminal has an interest in land by virtue of an agreement it has with the City of New York for supplying freight terminal facilities to the City's Wallabout Market of the kind

and to the extent that it may share in the award made to the City upon the condemnation of the Market by the United States of America. The United States paid into the court the sum of $4,000,000 for the land it condemned, cf. United States v. 53¼ Acres of Land, 2 Cir., Dec. 9, 1943, 139 F.2d 244; and out of this sum petitioner claims $700,000 or "such other amount as to the Court shall seem just and proper." The court first ordered a hearing to consider the nature of the interest created by the agreement, 42 F.Supp. 746, and later, after taking testimony on the preliminary issues thus created, determined that petitioner had no interest in the land, but only a contract with the City, which was frustrated by higher authority. 47 F.Supp. 887. Hence it entered the judgment appealed from, disallowing the petitioner's claim in full.

The Wallabout property was deeded in 1894 to the City of Brooklyn, to whom respondent has succeeded, in trust for use as market property. Cf. Grill v. City of New York, 282 N.Y. 471, 481–483, 27 N.E.2d 14; Bird v. Grout, 106 App.Div. 159, 94 N.Y.S. 127. The issue here turns upon the meaning and effect of an agreement between petitioner and respondent of November 16, 1935. The heart of this long and formal covenant, duly acknowledged by the parties and made binding also upon their successors and assigns, is in paragraph (1), viz.: "The City agrees: (1) The City will and hereby does grant for a term of ten years from the date hereof, except as hereinafter provided, to the Terminal, for the purposes of a freight terminal for market purposes, the right and privilege to construct, erect, maintain and operate a float bridge, float bridge protector-rack, float bridge dock approach and tracks, with the necessary railroad structures, appurtenances and equipment, in Wallabout Market in the Borough of Brooklyn, City of New York, in accordance with the map or plan hereto attached." And included in the same paragraph was a grant to the Terminal of "the right of renewal for a further term of ten years on the terms and conditions herein set forth" upon notice to be given to the City not more than eighteen nor less than twelve months prior to the expiration of the original term.

The map or plan referred to in this paragraph had already been described by title and "made part of this agreement" by "whereas" clauses which referred to the City's desire to have the market "served by a freight terminal equipped with team track and other facilities for the receipt, delivery, handling and transportation of carload freight, at or upon said premises" and the Terminal's willingness "to build, provide and maintain the necessary float bridge, tracks and track appurtenances to properly equip the Wallabout Market with a freight terminal in accordance with" this map. And the attached map is important, for it contains an exact and detailed layout, in place, of the facilities involved, including team track, private track, storage track, float bridge, float bridge protector-rack, and float bridge dock.

In the next four paragraphs the City provides for the closing of all but a strip of "Apple Avenue," and the blocking or closing of other streets "as may be reasonably necessary to facilitate the construction" of the freight terminal, for the granting of necessary construction permits, the providing of lights, the making and enforcing of rules preventing the peddling from freight cars and other obstruction of the driveways and tracks upon the premises. Then the Terminal agrees: "(6) That it will, at its own expense, construct the float bridge, float bridge protector-rack and float bridge dock approach and tracks substantially as shown on the map or diagram attached hereto and hereinbefore referred to, with the necessary railroad structures, appurtenances and equipment, and maintain the same at all times in good working order and condition, under the supervision of the Department."

Thereafter follow fourteen paragraphs (numbered 7 through 20) of further particular agreements by the Terminal, covering the construction of the float bridge, the tracks, the freight terminal, and the other facilities, the repair of the tracks and the area between the tracks and the rails, and for the transport of cars of freight by car floats or other means to the freight station from the terminals of various listed railroads, and with the further covenant that "the rights and privileges herein granted shall not be leased, sublet or mortgaged in any manner nor shall they be transferred or assigned" without the consent of the City by instrument under seal.

Next are eight paragraphs of mutual covenants and agreements (numbered 21 through 28), of which the first is important here: "(21) That the float bridge,

float bridge protector-rack, float bridge dock approach and tracks, with the necessary railroad structures and appurtenances and other buildings or structures erected pursuant hereto shall upon the expiration or sooner termination of the within right and privilege, revert to and become the property of the City of New York, without compensation to the Terminal." Then by paragraph (25), provision was made for termination of the agreement upon default of the Terminal after certain specified notice by the City Department of Public Markets, Weights and Measures; while paragraph (26) gave the City power to terminate the rights and privileges thus granted the Terminal at any time after the expiration of ten years, provided that "not less than one year's prior written notice shall have been given to the Terminal specifying the date of termination," and thus to acquire the float bridge and other structures specified, paying therefor a part of their cost of construction proportional to that portion of the contemplated total term of twenty years thus cut off.

This agreement was made to supersede an earlier agreement of July 11, 1935, which had called for the approval of the Public Service Commission of the State of New York. That Commission, however, refused to issue a certificate on the ground that the so-called streets on Wallabout Market were not public streets or highways and that hence the Commission did not have jurisdiction. A similar application to the Transit Commission was denied on the same ground. Hence the November agreement specifically recited that the proposed plan of construction involved construction in market ways, but not in any public streets, and that the references thereafter to certain avenues, including Apple Avenue, were to the market ways so called and so shown on the attached plan. The November agreement also provided that the City would impose a market price of at least $1 per car per day for the first day, and $3 for subsequent days, to be paid by the consignee and collected for the City by the Terminal. By supplemental agreement of April 18, 1936, this paragraph was modified to provide in substance that the Terminal would make the payments for the cars (with certain limited exceptions) at the rate of $1 per loaded car received.

It is to be noted, therefore, that the agreement, particularly as made specific by the map and plan incorporated in it, conveys rights to petitioner for the covenanted period which are at least as extensive as railroad rights of way and in some aspects are more extensive. In fact, the building and occupation of terminal facilities as specified make the interest more in the nature of a railroad freight station and terminal, hence of a greater degree of occupancy and possession, than of merely the use of tracks as in the ordinary railroad right of way. The only sense in which the interest here is less is that the period involved is a term of years, at the end of which the facilities used by the tenant become the property of the fee owner. But this in no way limits the extent of possession granted during the period, and the fact that title to the facilities does not pass to respondent until the end of the period serves to emphasize petitioner's ownership and possession until that time.

Petitioner also shows, and respondent does not deny, that petitioner proceeded to make the construction agreed upon at a cost price, adjusted with respondent, in excess of $100,000, with further expenditures for car floats, and that the land thus involved consists of identified parcels as shown on the Damage Map attached to the Government's condemnation petition, to wit, Damage Parcels 1–3, 46, 188–194, 198, and 201, constituting a strip on the western edge of the condemned track between the United States Navy Yard and the Wallabout Basin. Petitioner also produced evidence of constantly increasing net profits from its operations of these facilities, so that when the property was taken April 1, 1941, they substantially exceeded $100,000 a year.

The statute which defines the procedure for condemnation, 40 U.S.C.A. § 258a, provides for the acquisition "of any land or easement or right of way in land for the public use" and requires the declaration of taking to contain "a statement of the estate or interest in said lands taken for said public use." It is clear that unless petitioner's rights and privileges here amount to an estate or interest in the lands within the statutory meaning it is not entitled to share in the award, whatever possible claims it might conceivably have in some other forum on the basis of a frustrated contract or otherwise. Cf. New York Telephone Co. v. United States, 2 Cir., 136 F.2d 87; Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437,

67 L.Ed. 773. If, therefore, the district court is correct that petitioner had only a contract with respondent making it respondent's agent to supply freight facilities to the Market, then the denial to it of a share in the award was correct. But the points particularly stressed below, 47 F. Supp. at pages 887, 891–893, that petitioner did not have a franchise, that it was estopped to claim otherwise because of its successful objection to the levy of a franchise tax upon it, and that it was only respondent's agent to operate the terminal during a specified time do not appear to us to be controlling. It seems to be clear that, the market ways not being public streets, petitioner in truth did not have a franchise; but that fact does not prevent the existence of a substantial land interest of another form. Nor can petitioner be estopped, even if the required mutuality of parties exists, by reliance on the actual legal situation so far as it affected the claimed tax. Nor, even assuming the principal-agent relation here (a point we do not find it necessary to decide), is there anything to prevent such agency from being "coupled with an interest." Hunt v. Rousmanier's Adm'rs, 8 Wheat. 174, 204, 21 U.S. 174, 5 L.Ed. 589; Restatement, Agency, 1933, §§ 138, 139; 2 Am.Jur. 61–65. None of these conclusions below really settles the essential question whether petitioner has such an interest in land as to be entitled to compensation in this proceeding.

◼ In considering this problem in connection with another claimant to this same fund we said recently, United States v. 53¼ Acres of Land, supra, 139 F.2d at page 247: "We see no reason to grope about in the mysterious world of 'estates' and 'interests not estates.' The law of New York has put the matter on a very practical basis: a right with respect to property taken in condemnation may be so remote or incapable of valuation that it will be disregarded in awarding compensation; otherwise it will not be disregarded." And we went on to cite various New York cases where compensation had been awarded for various types of limited property interest, to arrive at the conclusion that the National City Bank was entitled to compensation for an inchoate right of redemption granted it by New York statute for its protection as mortgagee of the leasehold, subject to de-

feasance by prior redemption by the tenants themselves or lack of diligence in making tender. "There was enough likelihood of redemption by the Bank to give its right value, and that, we think, should be the test of its compensability."

◼◼ This states the principle on which we can properly act. There can be little doubt that easement rights are subject to compensation, as has been held, for example, in United States v. Sunset Cemetery Co., 7 Cir., 132 F.2d 163, and In re Public Beach, Borough of Queens, 269 N.Y. 64, 76, 199 N.E. 5. Here, as we have indicated, we think the rights are comparable, so far as occupancy of land is concerned, to at least railroad rights of way,[1] and these are clearly compensable. Western Union Tel. Co. v. Pennsylvania R. Co., 195 U.S. 540, 570, 25 S.Ct. 133, 49 L.Ed. 312, 1 Ann. Cas. 517; Village of Bradley v. New York Central R. Co., 296 Ill. 383, 129 N.E. 744. Seemingly the only doubt is as to whether the interests are in gross; for we question petitioner's contention that they can be considered appurtenant to petitioner's other terminal facilities located elsewhere in Brooklyn, any more than a main railroad line is to be considered permanently attached to a particular station site. Cf. In re Anthony Ave., 46 Misc. 525, 95 N.Y.S. 77, 79, affirmed 124 App.Div. 940, 109 N.Y. S. 1123, affirmed 196 N.Y. 513, 89 N.E. 1095; Antonopulos v. Postal Telegraph Cable Co., 261 App.Div. 564, 26 N.Y.S.2d 403, 408, affirmed 287 N.Y. 712, 39 N.E. 2d 931. But this seems unimportant for our purposes here. There appears no reason why compensation should not be paid for the taking of easements in gross. Borough Bill Posting Co. v. Levy, 144 App. Div. 784, 129 N.Y.S. 740; Rochester Poster Advertising Co. v. Smithers, 224 App. Div. 435, 231 N.Y.S. 315; Antonopulos v. Postal Telegraph Cable Co., supra; Saratoga State Waters Corp. v. Pratt, 227 N.Y. 429, 444, 445, 125 N.E. 834; Mayor, etc., of New York v. Law, 125 N.Y. 380, 392, 26 N.E. 471; and see generally Cormack, Legal Concepts in Cases of Eminent Domain, 41 Yale L.J. 221, 241, 242; McCormick, The Measure of Compensation in Eminent Domain, 17 Minn.L.Rev. 461, 470–475; Conard, Easement Novelties, 30 Calif.L.Rev. 125, 143. Further, while railroad rights of way are loosely termed ease-

---

[1] Respondent impliedly concedes the similarity by saying that the privilege of a freight terminal company, not part of a franchised railroad line, cannot have the same legal attributes as a railroad right of way.

ments, it has been often pointed out that they are a more substantial interest than a mere easement in gross. Thus, in Western Union Tel. Co. v. Pennsylvania R. Co., supra, 195 U.S. at page 570, 25 S.Ct. at page 141, 49 L.Ed. 312, 1 Ann.Cas. 517, it is said that such a right is "more than a mere right of passage," and is "more than an easement," that it has "the substantiality of the fee," and "cannot be appropriated in whole or part except upon the payment of· compensation."[2] See, also, various other cases there cited; Clark, Covenants and Interests Running with Land, 1929, 65; Nichols, Eminent Domain, 2d Ed.1917, §§ .150, 192; 20 Ill.L.Rev. 183; 8 Va.L.Rev. 383.

■ Hence we conclude that the interest here, in fact more substantial than the ordinary railroad right of way, is compensable, and the New York cases seem thoroughly in accord. In re Public Beach, Borough of Queens, supra; Greenwood Lake & P. J. R. Co. v. New York & G. L. R. Co., 134 N.Y. 435, 31 N.E. 874; In re Pier Old No. 49, East River, 227 N.Y. 119, 124 N.E. 148; and City of New York v. New York & South Brooklyn Ferry & Steam Transp. Co., 231 N.Y. 18, 21, 131 N.E. 554, 555, 16 A.L.R. 1059. The last case seems particularly apposite, for it and the prior litigation to which it refers show the award of compensation for a revocable privilege to a railroad for "the use of a space, 100 feet square, for a car stand and for switching purposes at its Brooklyn terminal." True, since most human affairs are still conducted on the earth's surface, it may be argued that some "interest in land" is implicitly granted with most contractual privileges. That, however, proves too much; unless the parties contemplate some more particularized use of land than that, we do not find a real property interest, at least requiring the award of compensation. Our task is to discover the parties' intent as to the privileges and rights granted and then to make a proper evaluation of what we have found in the light of analogies and precedents. Cf. Conard, supra, 30 Calif.L.Rev. at 146;

Conard, An Analysis of Licenses in Land, 42 Col.L.Rev. 809, 824; Clark, Covenants, 41, 42. As so often in law, the final line of demarcation may be vague and shadowy; but we think the interest here too substantial to justify doubt. Conviction is indeed increased by a case particularly relied upon by respondent, Frank Warr & Co. v. London County Council, (C.A.) [1904] 1 K.B. 713, denying compensation, upon condemnation of a theatre, to the holder of an exclusive privilege for twenty-one years to supply refreshments in the theatre, together with necessary use of the refreshment rooms, bars, and wine cellars. Whether or not the same result would obtain in New York (cf. Meers v. Munsch-Protzmann Co., 217 App.Div. 541, 544, 217 N.Y.S. 256, 259, with In re Neptune Ave., 254 App.Div. 690, 3 N.Y.S.2d 825, reargument denied 254 App.Div. 869, 6 N.Y.S.2d 343, affirmed 280 N.Y. 604, 20 N.E. 2d 557), the contrast in extent of interest between a freight terminal and a theatre refreshment concession is surely striking.

■ That petitioner had here only an interest for a term of years, with option of renewal, does not change the legal situation; we pointed out in United States v. 53¼ Acres of Land, supra, that a tenant with right of renewal was entitled to compensation, citing Matter of City of New York (North River Water Front), 118 App. Div. 865, 103 N.Y.S. 908, affirmed 189 N.Y. 508, 81 N.E. 1162, and distinguishing Matter of City of New York (Upper New York Bay), 246 N.Y. 1, 33, 157 N.E. 911, reargument denied 246 N.Y. 549, 159 N.E. 646, certiorari denied, Greater New York Dock & Warehouse Co. v. Stapleton Dock & Warehouse Corporation, 276 U.S. 626, 48 S.Ct. 320, 72 L.Ed. 738. See, also, In re William & Anthony Streets, 19 Wend., N.Y., 678; In re Water Front in Tompkinsville, 219 App.Div. 387, 220 N.Y.S. 23; In re Triborough Bridge Approach, 159 Misc. 617, 288 N.Y.S. 697, 705; 41 Harv.L.Rev. 100. Respondent's power of termination after ten years, under paragraph (26) of the agreement, and the possibility of its exercise do not prevent award

---

[2] The holding in Great Northern R. Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836, that the railroad had only an easement, and hence no rights to underlying oil and minerals in public lands of the United States, concerned a quite different problem and is consistent with this view; note the argument of· the United States, 315 U.S. at page 269, 62 S.Ct. at page 529, 86 L.Ed. 836: "The purposes of Congress are accomplished if the grant is held to be a 'fee' in the surface and so much of the subsurface as is necessary for support—a 'fee' for a railroad thoroughfare exclusively," citing the Western Union case.

for the later period, though it is a proper subject for consideration in fixing values. In re William & Anthony Streets, supra; In re Pier Old No. 49, East River, supra; Reichelderfer v. Quinn, 287 U.S. 315, 323, 53 S.Ct. 177, 77 L.Ed. 331, 83 A.L.R. 1429; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 289, 63 S.Ct. 1047, 87 L.Ed. 1390; 29 Corn.L.Q. 236, 241–243. And the provision in paragraph (21) for reversion of the facilities to respondent upon the expiration or sooner termination of the "within right and privilege" is not to be construed to refer to condemnation. As in Re Willcox, 165 App.Div. 197, 151 N.Y.S. 141, there is no suggestion that the parties contemplated a taking of the interests of both by some higher authority; more probably they had in mind a termination such as that referred to in paragraph (25) upon petitioner's default, which was to have "the same force and effect as if the date thereof had been originally fixed herein for the termination of the Agreement."

The proceeding must, therefore, be remanded to the district court for an award of appropriate compensation. But we should say something now as to petitioner's claim for its loss of profits for the remainder of the original term and for one additional year. The settled rule is that the owner's loss, not the taker's gain, measures the compensation to be awarded, Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725; United States ex rel. T. V. A. v. Powelson, supra, 319 U.S. at page 281, 63 S.Ct. 1047, 87 L.Ed. 1390;[3] but the "concept of market value" sets the "practical standard." United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. Here we have an interest not bought and sold in the market,

and sale value must be somewhat hypothetical, though probably not unusually so as condemnation values go. See In re Public Beach, Borough of Queens, supra, 269 N.Y. at page 76, 199 N.E. 5; United States ex rel. T. V. A. v. Powelson, 4 Cir., 138 F.2d 343, 345; Hale, Value to the Taker in Condemnation Cases, 31 Col.L.Rev. 1, 13. Loss of business profits as such is not allowable, Mitchell v. United States, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644; but in default of more direct evidence of sale value, present value (i. e., as of the time of taking) of clearly to-be-expected future earnings may be considered. See Sanitary District v. Pittsburgh, Ft. W. & C. R. Co., 216 Ill. 575, 584–586, 75 N.E. 248; James Poultry Co. v. Nebraska City, 136 Neb. 456, 286 N.W. 337; and cf. In re Sixth Ave. Elevated R. R., 265 App.Div. 200, 38 N.Y.S.2d 730, 737; 40 Yale L.J. 779, 781. No particular significance attaches to the date of one year after the expiration of the original term; contrary to what seems to be petitioner's thought, respondent may give its proper notice—after it has received petitioner's notice of renewal under paragraph (1)—so as to terminate the interest at the end of ten years. But, as we have seen, the option to renew may itself properly be considered an item of added value. The endeavor must be for the court, applying as objective standards as are possible under the circumstances, to find a fair equivalent in money's worth for petitioner's loss. In re Seventh Ave. and Varick Street, 196 App.Div. 451, 188 N.Y.S. 197, 204; United States v. 2.4 Acres of Land, 7 Cir., 138 F.2d 295, 297; Edmund Realty Co. v. Walmer Bldg. Co., 8 Cir., 123 F.2d 54.

Respondent, in its affidavit, asserted that the minimum total valuation of its property was "greatly in excess" of the four millions now available for division.

[3] Thus, the rule is applied constantly to easements, including equitable restrictions, as to other property interests. United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A., N.S., 385, 19 Ann.Cas. 680; In re West Tenth St., 267 N.Y. 212, 196 N.E. 30, 98 A.L.R. 634; In re Public Beach, Borough of Queens, supra; Town of Stamford v. Vuono, 108 Conn. 359, 143 A. 245; In re Petition of Dillman, 263 Mich. 542, 248 N.W. 894. Rarely it has been suggested that the rule should be, instead, the amount by which the value of the servient land was lessened by reason of the easement, cf. Hayes v. Waverly & P. R. Co., 51 N.J.Eq. 345, 27 A. 648; but this is at best highly unrealistic (as in the present case, where petitioner's interest, if anything, adds to the value of respondent's property) and hardly fulfills the constitutional requirement of "just compensation," defined in United States v. Miller, infra, 317 U.S. at page 373, 63 S.Ct. at page 279, as "the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."

Here the total value of the entire premises was paid into court by the condemnor, a course not always applicable, Boston Chamber of Commerce v. City of Boston, supra, yet often followed as both convenient and equitable. Matter of Trustees of the New York & Brooklyn Bridge, 137 N.Y. 95, 32 N.E. 1054; In re Delancey Street in City of New York, 120 App.Div. 700, 105 N.Y. S. 779; United States v. Miller, supra. On this record we cannot say whether respondent's assertion is well founded, and if so, whether petitioner is at least partially to be blamed for the low award. Cf. Silberman v. United States, 1 Cir., 131 F.2d 715, 718. But we think it proper to point out that petitioner's claim here is properly for an equitable apportionment of the total sum based on the extent of its interest, rather than merely for some absolute value considered in vacuo. In re Allen St. and First Ave., 256 N.Y. 236, 242, 243, 176 N.E. 377; In re Daly, 29 App.Div. 286, 51 N.Y.S. 576; Edmund Realty Co. v. Walmer Bldg. Co., supra.

Reversed and remanded for further proceedings not inconsistent with this opinion.