**UNITED STATES of America,**
**Petitioner-Plaintiff,**

v.

**51.8 ACRES OF LAND, MORE OR LESS, situate in the TOWN OF HEMPSTEAD, NASSAU COUNTY, State of NEW YORK; and Town of Hempstead, County of Nassau, The People of the State of New York; unknown owners, Defendants.**

**C. P. No. 100.**

United States District Court
E. D. New York.

Dec. 31, 1956.

Harry T. Dolan, Sp. Asst. to the U. S. Atty. Gen., for petitioner-plaintiff.

G. Frank Dougherty, New York City, for defendant, Jones Beach State Parkway Authority.

GALSTON, District Judge.

This is a motion by the Jones Beach State Parkway Authority (hereinafter referred to as the "Authority") to vacate and set aside a Declaration of Taking, pursuant to Section 258a, 40 U.S. C.A., filed by the United States, and the accompanying deposit in the amount of $50,000, or, in the alternative, to direct the United States to file an amended Declaration of Taking, increasing the estimate of the value of the property taken and the amount of the deposit made with the court.

The Government instituted condemnation action against the land in question on September 26, 1955, by filing a notice and complaint. Paragraph 3 of the complaint alleged that the "Secretary of the Air Force has requested that an order of court be procured granting to the United States of America immediate possession of said lands upon the filing of this complaint"; and the complaint contained a prayer that "an order of this court be made and entered forthwith granting * * * immediate possession * * *." On September 27, 1955 an ex parte order was made and entered, granting to the United States the immediate possession and exclusive use and occupancy of the lands sought to be acquired "for the purposes as set forth in the complaint in condemnation." The affidavit of Harry T. Dolan, Special Assistant to the Attorney General of the United States, states that immediately upon the institution of the action and entry of the order of possession on September 27, 1955, the Government entered into possession, use and occupancy of the lands involved, and has proceeded to construct an extension of an existing airfield runway, clearance zone, and other improvements (not described) necessary and incidental to the use of the lands as part of the Mitchel Field Air Force Base. According to the affidavit, at the present time the construction and improvements made by the Government on said land have been ninety-nine percent completed.

There was deposited with the court by the United States, the sum of $50,000 as "estimated just compensation," recited and set forth in the Declaration of Taking. The property in question was part of a parcel of approximately 200 acres acquired from the Meadowbrook Club by the Authority in May, 1953 and September, 1954. It was acquired by the Authority for parkway and park purposes in connection with the extension of the Meadowbrook State Parkway.

From the affidavit of Robert Moses, President of the Authority, and the exhibits annexed thereto, it appears that a series of negotiations took place prior to the purchase by the Authority from Meadowbrook between the Authority

and the United States respecting the proposed extension of the Meadowbrook State Parkway. In a letter, dated May 22, 1952, to the Secretary of the Air Force, Mr. Moses suggested that it was logical for the Air Force to take the opportunity to enlarge and to round out Mitchel Field while the Parkway right-of-way was being acquired. A letter dated June 5, 1952 in reply was received by Mr. Moses from the Assistant Secretary of the Air Force, reading, in part, as follows:

"This matter has been given most careful consideration; however, the presence of residential and industrial areas immediately adjacent to Mitchel Air Force Base already limits aircraft operations, and no further expansion of air operations at this Base is possible. Accordingly our plans for Mitchel do not provide for its physical expansion."

Again, in a letter from the Office of Under Secretary of the Air Force, dated July 9, 1952, it was stated:

"Despite the almost complete absence of buildings in this recreational area, the residential and developments in other areas surrounding the air base are so restrictive as to render impracticable further expansion of air operations of the installation. * * * The Air Force does not anticipate future physical expansion of the air base."

The Moses affidavit states that inasmuch as the Air Force had represented that it would not enlarge the air base, the Authority proceeded, in 1953 and 1954, to acquire from the Meadowbrook Club 200 acres of land for parkway and park purposes, including approximately 128 acres bordering on the Mitchel Field Air Force Base. The affidavit also states that there were located on the 128 acres, nine holes of the Club's golf course which were not affected by the building of the new parkway extension, and that it was expected the recreational area containing the nine-hole golf course was capable of producing "substantial revenue." The affidavit states that the Air

Force was advised of the negotiations with the Meadowbrook Club and knew that the Authority intended to and did purchase the 200 acres, including the property involved in this proceeding, from the Club at a cost of $6,000 per acre.

During the period of the negotiations with the Meadowbrook Club, the authority also negotiated with the Air Force for a parkway easement through Government property in connection with the parkway extension project. It appears that during the negotiations it was made clear to the Government that the property acquired by the Authority from the Meadowbrook Club and lying between the parkway and the Mitchel Field base would be restricted to park use only. The Authority and Government entered into a written agreement, dated January 4, 1954, whereby the Authority granted to the Government an avigation easement over the Authority's acquired property east of the Mitchel Field base, and, in turn, the Government granted to the Authority a perpetual parkway easement through Government property. Paragraph 2-h of this agreement provided that the property acquired by the Authority from the Meadowbrook Club, and lying between the parkway proper and the Mitchel Field base, would be restricted to park use only, and that

"Any recreational facilities maintained by the Authority shall be made available, without charge, to personnel of the Department of Defense."

The nine-hole golf course referred to above was included within the area referred to in paragraph 2-h of the foregoing agreement. It further appears that three holes of the nine-hole golf course are on property included within the 51.8 acres involved in the Government's Declaration of Taking.

It is the Authority's contention that the "estimated just compensation" of the 51.8 acres should be valued at $6,000 per acre, or $310,800. Six thousand dollars per acre was the price paid by the Authority to Meadowbrook. Fur-

thermore, the Moses affidavit states that competent appraisers have advised that the destruction of the valuable asset consisting of the nine-hole golf course, by virtue of the loss of the three holes, has resulted in damage to the Authority of not less than $200,000. It is contended, therefore, that the Government should deposit the sum of $510,800 as "estimated just compensation."

The Dolan affidavit, in opposition to the motion, states that the "estimated just compensation" recited in the Declaration of Taking, in the amount of $50,000, "was predicated and based upon a written appraisal obtained by the Department of the Air Force from a local real estate appraiser, thoroughly qualified to appraise lands in Nassau County, and who has on many occasions appeared as an expert on real estate values before this court, and on several occasions in connection with the valuation of lands forming a part of the Mitchel Air Force Base." The Dolan affidavit also states:

"9. Since the institution of this action, deponent employed another local real estate appraiser, who has likewise appeared as an expert on real estate values in Nassau County before this Court, to reappraise such interests in the lands herein involved, as were owned by the State of New York at the time of the institution of this action. Deponent has received from said appraiser a written appraisal report covering such interest of The State of New York in the lands herein involved, and the value of the interest of The State of New York in these lands at the time of the taking herein was appraised at a far lower amount than the estimate of just compensation made by the Secretary of the Air Force and the deposit of estimated compensation made in this action."

In seeking to justify the amount of $50,000 deposited by the Government as estimated just compensation, the Dolan affidavit contends that the difference in that amount and the $510,800 set forth by the Authority "results largely from the depreciation in the fair market value of this property which resulted from the encumbrance placed upon this property * * * as set forth in the Grant of Easement * * *." The reference is to the avigation easement granted to the United States by the Authority, and the affidavit contends that the effect of the easement is that it

"* * * largely or entirely destroyed the utility of this land for any conceivable use and substantially, if not completely, destroyed and eliminated any market or demand for this land for any commercial, residential or industrial use. That such grant and easement rendered the land unusable as a golf course or for recreational uses."

The Authority, on the other hand, contends that the purpose of the statute would be thwarted were the Government permitted to file a notice of taking, "which is plainly inadequate or if the estimate be not made in good faith." It contends also that the amount of the deposit, as it bears no relation to the value of the property taken, is merely a "nominal sum" and does not represent just compensation. Presumably this latter argument is an attempt to show that the Government's action was not in conformity with the statutory requirement of "just compensation." 40 U.S.C.A. § 258a

In United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, the Supreme Court, in defining what is meant by "just compensation" in the Fifth Amendment of the Constitution, stated, 317 U.S. at page 373, 63 S.Ct. at page 279:

"Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken."

In support of the estimate of just compensation set forth in the Declara-

tion of Taking, the Government argues that it is a proper estimate because it has taken into consideration the depreciation in the fair market value of the property which, so it contends, resulted from the avigation easement encumbering it at the time of taking. It it argued that the effect of this avigation easement, created in favor of the Government, was substantially to destroy the use of the land in question for any commercial, residential or industrial use. Furthermore, according to the Government, the easement rendered the land unusable for recreational purposes. The latter contention, however, appears contradictory to the Government's actions, for it has expressly recognized in its dealings with the Authority subsequent to the granting of the easement, that the land would and could be used for recreational purposes. In fact it thought sufficiently of the benefits of the recreational facilities to be maintained by the Authority on the land in question as to obtain, as part of the consideration for the easement granted to the Authority on Government land, the right for personnel of the Department of Defense to use such facilities without charge.

The Government had full knowledge at the time of the taking that the Authority had acquired the property for parkway, park and recreational purposes. It would seem from the Dolan affidavit, however, that the Government's estimate of just compensation was based not on the special purpose for which the Authority acquired the property, paying $6,000 per acre for such purpose, but on what it considered its fair market value. It would also appear from the affidavit that the effect on future commercial, residential or industrial use of the property of the avigation easement was considered by the Government in terms of fair market value. Although the Dolan affidavit refers to written appraisals obtained by the Air Force from "local real estate appraisers", the reports were not submitted on this motion, nor is there any showing as to the bases upon which these local appraisers arrived at their appraisal value. Therefore, it cannot be determined from the motion papers whether any consideration or weight was given by these appraisers to the special use for which the land in question was acquired by the Authority.

It may well be that property for parkway, park and recreational, or other special uses cannot be measured by the same standards of value that are used for property ordinarily used for commercial, residential or industrial uses. For example, the Supreme Court, in United States v. Miller, supra, stated, 317 U.S. at page 374, 63 S.Ct. at page 280:

"Where, for any reason, property has no market resort must be had to other data to ascertain its value; * * *."

Moreover, in condemnation proceedings it is the owner's loss and not the taker's gain which measures the compensation to be awarded. Brooklyn Eastern District Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 152 A.L.R. 296, certiorari denied 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579. See also Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725.

Therefore, the question whether the local real estate appraisers employed by the Government based their determination on considerations of fair market value as used for valuing ordinary private property for commercial, residential or industrial uses, and did not consider the special purposes for which the land was acquired and put to use, would be relevant and material on the question of whether the Government acted arbitrarily in establishing its estimate of just compensation under the statute.

The Authority also contends, as already indicated, that it is entitled to have included in the estimate of just compensation the amount of $200,000, as severance damages for the destruc-

tion of the nine-hole golf course, by virtue of the fact that the Government has included in the condemned land three holes of the nine-hole golf course. Unquestionably the Authority is entitled to the inclusion of damages for the loss of the use of the golf course as part of the just compensation to which it is entitled.

"Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings. One of these is that a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of a part or all of it." United States v. Miller, supra, 317 U.S. at pages 375–376, 63 S.Ct. at page 281.

It is reasonable to expect that any estimate of just compensation should include such severance damage. However, the only evidence of the value of the damages resulting from the severance of the three holes of the golf course is a statement in the Moses affidavit that Commissioner Moses has "been advised by competent appraisers that the destruction of the valuable asset consisting of the nine-hole golf course has resulted in damage to the Authority of not less than $200,000."

On the question of the Government's good faith in instituting the present condemnation proceedings shortly after it had expressly and categorically stated it does not expect any future expansion of Mitchel Field, and soon after it had secured an avigation easement which it alleges has greatly diminished the value of the land in question, it may be noted that the Government has not submitted any evidence on this motion showing the reasons for the apparent change of view with respect to expansion of its air field base. Nevertheless, there is a failure properly to show how the lack of good faith, if any, on the part of the Government affects the estimate of just compensation made in connection with the Declaration of Taking.

Therefore, the motion must be denied. However, relief will be granted to the extent of requiring the Government to furnish the Authority with a copy of the written appraisal reports upon which the Government has based its estimate and deposit, on condition that the Authority in turn furnish the Government with a copy of the written appraisal report or reports upon which it has based its claim for severance damages of not less than $200,000.

It may be noted, as set forth in the Dolan affidavit, that the condemnation proceedings are set for trial in the February, 1957, term of this court. Therefore, it is directed that the foregoing copies of appraisal reports be made available within twenty days from the filing of this decision to the respective parties. The Authority is granted leave to renew this motion after it has considered the Government's appraisal reports, if it deems it advisable so to do.

Settle order.