## UNITED STATES v. CITY OF NEW YORK
### (and ten other cases).

Nos. 94, 95, 109–111, 120, 127–131.
Dockets 21807, 21808, 21824–21826, 21836, 21865, 21867, 21871, 21872, 21875.
United States Court of Appeals
Second Circuit.

Argued Dec. 14, 1950.

Decided Jan. 9, 1951.

Harry T. Dolan, Sp. Asst. to Atty. Gen., and S. Billingsley Hill, Atty., Dept. of Justice, of Washington, D. C. (A. Devitt Vanech, Asst. Atty. Gen., and Roger P. Marquis, Atty., Dept. of Justice, of Washington, D. C., on the brief), for the United States.

Benjamin Offner, of New York City (John P. McGrath, Corp. Counsel, Harry E. O'Donnell, Bernard H. Friedman, and Philip L. Wellens, all of New York City, on the brief), for defendant-appellant-appellee City of New York.

Henry Herz, of New York City (Parsons, Closson & McIlvaine, Charles P. Kramer, and William M. Sperry, 2d, all of New York City, on the brief), for defendant-appellant-appellee Brooklyn Eastern Dist. Terminal.

Bernard L. Bermant, of New York City (Skinner & Bermant and George Bergen, all of New York City, on the brief), for defendants-appellees Kings County Refrigerating Co., Anne E. Dannemiller, James T. McDonald, and Edward J. McDonald, individually and as executors, etc., and Bortolo Bendin, Inc.

Walter Bruchhausen, of New York City (Duncan & Bruchhausen, of New York City, on the brief), for defendant-appellee Anna D. Sagemann.

Nathan L. Goldstein, of New York City (Mario L. Clinco, of New York City, on the brief), for defendant-appellee Sclafani Bros., Inc.

Ira I. Gluckstein, of New York City, for defendants-appellees Arthur Boeckmann and Clara Martin, executors of estate of Anna C. Boeckmann, deceased.

Alfred J. L'Heureux, of New York City (Morgan, Lockwood & L'Heureux, Peter X. McManus, and David Drescher, all of New York City, on the brief), for defendants-appellees City Bank Farmers Trust Co., as trustee of estate of William Kornblum, deceased, and Alice Kornblum et al., executors of estate of Abraham Kornblum, deceased.

Clyde Brown, Jr., of New York City (C. Austin White, of New York City, on the brief), for defendant-appellee New York Cent. R. Co.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is another and, it is to be hoped, the final chapter in the lengthy litigation involving the condemnation by the United States of New York City's "Wallabout Market" for expansion of the Brooklyn Navy Yard in 1941. References to the earlier stages of the litigation are set forth in the last case before us, United States v. 53¼ Acres of Land, etc., 2 Cir., 176 F.2d 255, out of which the present case arises. For there we were dealing with the final problem of the interest properly payable upon the awards of fair compensation to the various claimants as ultimately set in the litigation; and we reversed the district court's decision, D.C.E.D.N.Y., 82 F.Supp. 538, which had required the United States to pay interest at 6 per cent from the date of taking April 1, 1941, to the date of payment of the funds to the claimants, notwithstanding the substantial deposits in court previously made by the United States. In our opinion we set forth certain principles as to payment of interest, based upon the Declaration of Taking Act, 40 U.S.C.A. § 258a, and the precedents construing it. In general terms these excused the government from the payment of interest on money deposited in court and within the power of the court to distribute, even though distribution had not been made and was actually delayed by reason of the disputes inter se of the claimants over questions of title. On remand the district court has again awarded further interest to some ten claimants, including the City of New York and the Brooklyn Eastern District Terminal, on the theory that the government's opposition to applications for withdrawal had led to the court's action in retaining substantial sums in the court's registry. The United States has appealed in all these cases, contending that it made no such opposition justifying the award of interest against it on the sums held in court. In two of these cases the City of New York and the Brooklyn Eastern District Terminal also appear as appellants, claiming greater awards than they actually received below. In the eleventh and final appeal before us the City is the sole appellant from an order of the district court requiring it to pay interest on a refund of prepaid rent from its lessee the New York Central Railroad Company.

We do not need to rehearse the facts in detail which appear from earlier opinions, particularly those cited above, 82 F. Supp. 538; 176 F.2d 255, dealing with the problem of interest. When the United States filed its petition for condemnation and declaration of taking on April 1, 1941, it deposited with the court the sum of $4,000,000, then estimated to be just compensation for the property. On May 11, 1945, it amended its declaration of taking and deposited an additional sum of $261,230. On June 3, 1948, it also deposited with the court an additional $1,660,687.48, which made the total of the deposits equal to the amount of the final award, namely, $5,387,816, plus an additional amount exceeding a half million dollars on account of estimated deficiency interest, computed by the government on the amounts and over the periods when its deposits were less than the final award. The City of New York was the owner of the fee of the 53¼ acres involved, and on this there had been numerous improvements and there were many lessees of the fee owner who had compensable subordinate interests. Actually there were originally more than six hundred defendants to the proceedings. On July 18, 1941, the City applied for withdrawal of $3,000,000 and was allowed by the court to withdraw $2,500,000. Other claimants here involved likewise made application on various dates and were allowed by the court to withdraw amounts less than had been requested or were ultimately awarded. When our decision in United States v. City of New York, 2 Cir., 165 F.2d 526, 1 A.L.R.2d 870, explicitly settled a series of final questions as to the persons interested in the awards and their appropriate shares, the parties in June, 1948, entered into a stipulation approved by the court carrying out the terms

of our mandate and settling the final amount to be awarded claimants as $5,387,-816, of which $4,008,687 was the share of the City (subject, however, to the payment out of this of certain specified sums to other claimants). Thereafter arose the problem as to interest with our reversal of the district court's award as previously noted. After our decision the district court again considered the question and in each case held the United States for interest not only upon the amounts of the deficiencies in the deposits, as conceded by it, but also upon the amounts deposited but retained in the court's registry until the final payment date of June 3, 1948. The validity of this latter action is the substantial question on this appeal.

On the face of the record alone the United States quite obviously has the better of the argument. For the court orders allowing the withdrawals specifically and carefully refer to government counsel as "appearing but not opposing" the motions. Thus the first and vitally important order of July 18, 1941, allowing the limited withdrawal by the City stated above has the explicit statement to this effect quoted in full in the footnote.[1] Other pertinent orders affecting other claimants are equally precise.[2] In finding governmental opposition, contrary to this record, the district judge relied both upon his own remembrance of conferences in chambers with counsel leading to the adoption of the figures set for the respective withdrawals in the various court orders and upon the affidavits from counsel for the City and for the various claimants stating their present recollections of these conferences and as-

serting governmental opposition to all withdrawals in excess of the figures ultimately incorporated into the orders. All this the United States vigorously challenges by counter affidavits on the facts and the law.

It would be indeed regrettable if decision had necessarily to turn upon disputes among counsel, participated in by the trial judge, as to what had occurred at conferences outside the courtroom some years ago now relied upon to vary the recitals of official court judgments. Such impact of bygone oral negotiations on the distribution of governmental funds of large amount would suggest an approach of a casualness which must surely be termed at least unlawyerlike; and there must also arise question whether the integration of all informal negotiations into a formal document approved by all the parties (in the City's case drafted by it) and accepted by the court as its judgment can be set aside for anything less than fraud. But we think decision here is actually much simpler, for the result below involves a misinterpretation of or an attempt to retreat from our mandate on the previous appeal. For on any of the theories presented to us, it appears to us clear that, whatever the action of counsel for the United States, it did not amount to a withdrawal or withholding of the deposited funds on any issue as to the *value* of the property condemned. All the various affidavits and the judge's recollection show that the assistant government counsel to whom the restrictive statements were attributed—who was not the counsel in chief for the United States throughout these proceedings—was interested only in avoiding an overpayment to disputing

1. The recital preceding the formal order states, inter alia: "* * * and upon all the papers and proceedings heretofore had herein, and after hearing William C. Chanler, Corporation Counsel, attorney for the petitioner, by Charles Bisberg, Assistant Corporation Counsel, in support of said motion, and Harry T. Dolan, Special Assistant to the Attorney General of the United States, attorney for the Petitioner-Plaintiff, by Edward H. Murphy, Special Attorney, Department of Justice, appearing but not opposing said motion, and after hearing"

certain counsel, fifteen in number, whose names were set forth and who were actually opposing the City's motion in the interest of various claimants.

2. As examples there may be cited the order of March 24, 1942, on motion of appellee Sagemann, that of Jan. 7, 1942, on motion of appellee Sclafani Bros., Inc., and that of Nov. 25, 1941, on motion of appellees Boeckmann et al., each referring to government counsel as "appearing but not opposing said motion." No pertinent order omits the statement.

claimants for essentially the same fund.[3] We find nothing which, fairly appraised, seems in any way inconsistent with this position. And of course it makes logical and rational what otherwise would seem vastly strange in not merely the court judgments we have quoted, but also the actions of the parties, including the fact that the government, instead of attempting to reduce its deposit, actually increased it.

That the error in the judgments below stem from a misreading of Judge Chase's opinion, 2 Cir., 176 F.2d 255, 258, is also indicated by the emphasis placed upon the references in the opinion to governmental opposition to withdrawals, thus overlooking the careful differentiation there made as to the steps properly open to government counsel in safeguarding its interests. As there pointed out, it was not only the right, but also the duty, of counsel to avoid overpayment to one claimant as against another on disputes as to ownership. No new law was being stated; for, indeed, "the applicable law seems to be fairly well settled." Of necessity we had to go back to the statute itself, 40 U.S.C.A. § 258a, which clearly specified that "interest shall not be allowed on so much [of the amount finally awarded] as shall have been paid into the court." We could not overturn this mandate had we wished to do so; and hence much of the argument addressed to us is beside the point. As the United States says in its briefs, the so-called judicial exceptions we accepted and stated were more apparent than real; they were cases where the government, by subsequent action, had in effect withdrawn a part of the deposit it had made. Thus we said: "The government may not however retain the benefit of a deposit once made if it in effect withdraws that deposit by its later action in the proceeding. If the government reduces the amount of the deposit or opposes payment on the ground that the withdrawal requested exceeds the value of the property, it becomes liable for interest on the amount by which the deposit is thus reduced." 176 F.2d 255, 259.

We then went on to point the contrast between the case "where the government opposes withdrawal of compensation for an interest taken on the ground that the interest was not one the value of which was included in the estimated compensation" and its right "to be heard in respect to the validity of the claims and the amount which any applicant was entitled to withdraw," in order to avoid overpayments which might not be recoverable. As we put it succinctly, "provided it did not dispute the right of one who could establish title to withdraw a proportionate share, it was not opposing withdrawal in the sense that it was freezing its deposit. The time thus taken was not delay in payment caused by the government but delay, caused by the multiplicity and nature of the interests for which claimants were entitled to be paid, inherent in the proceedings whereby the court was enabled to make its orders." And the point is reiterated further that "when application was made and withdrawal denied on the ground of a dispute as to the validity of the title asserted, no interest is allowable." [4]

The district court was affected by what it considered the unwillingness of government counsel to produce its own allotments

3. Since, as pointed out below, government counsel has both a right and a duty to take action accordingly, we do not need to examine the further contention of counsel that he was required by local court rule adopted early in the proceedings to act substantially as a friend of the court in making such suggestions as he could as to the validity of conflicting claims and the proper distribution of the fund.

4. We also stated that where "no application was made for any withdrawal, no deficiency interest is allowable," citing United States v. 0.45 Acre of Land, 2 Cir., 151 F.2d 114, and then went on to say that if application was made and denied, or allowed in part only on the ground that the demand was excessive, then interest was allowable on any part of the final award, in excess of any amount withdrawn or conceded by the government to be withdrawable, "from the date of taking to the date of payment." 176 F.2d at page 259. The United States suggests that the reference here to "the date of taking" is inadvertent, being somewhat inconsistent with the earlier statement and the cited

of amounts used in computing its estimate of fair value among the various claimants. The court also was apprised of the manifest hardship to claimants who are denied both their property and the use of the money over some years, in the present instance amounting often to a denial of upwards of 50 per cent of the ultimate award for a period in excess of seven years. That the results are harsh is certainly obvious; unfortunately it remains true that condemnation for public purposes is cruel at best, and certainly the taking of a crowded city area must be attended with confusion, difficulty, and costly consequences to innumerable interests involved. Yet the needs of war developments are so outstanding that the legislative approval of governmental activity appears always sure and immediate. Any contrary rule is likewise fraught with obvious attending difficulties. The United States cannot be frustrated in its war effort by innumerable delays, and hence the taking must be immediate. And if interest is to be paid at the judicial rate of 6 per cent for whatever procrastination in litigation may result from complexity, judicial deliberateness, or the indiscriminate pressing of variegated claims, ill or well founded, then would delay prove a veritable bonanza to many at government expense. Whether or not there is some middle position which could be properly worked out to avoid at least extremes of hardship may well be a challenging legislative problem, but is certainly not for the courts. We are confined to carrying out the well settled principles which bind us and determine our action.

■■■ Our conclusion that there was thus once again error in assessing interest against the United States upon amounts deposited in, but not distributed by, the court calls therefore for reversal at the instance of the United States in ten of the eleven appeals before us. It remains only to restate and settle the details upon which

interest should properly be computed. Nearly a million dollars remained available for distribution, but undistributed, in the registry of the court throughout the proceeding; and upon this amount the United States is not required to pay interest. Interest is, however, required to be paid upon the amounts by which the United States was deficient in its deposits fom the total ultimate awards made against it. The only way that allocation may be properly made among the various claimants is, as the United States urges, that the proportionate amount of the deposits when made to the total ultimate awards be considered as a proper ratio to determine the distribution of interest among the claimants. The answer is somewhat complicated by the additional deposit made by the government on May 11, 1945, with its final payment based on further additional deposits on June 3, 1948. But it is still only a matter of taking the proportions deposited at the times when made to the total ultimate award to obtain the correct proportions governing the interest awards. As counsel for the United States state: "Thus, after the awards had been ultimately determined it could then be ascertained that from April 1, 1941, to May 11, 1945, the government had deposited for the use and benefit of all persons who were entitled to share in the compensation to be paid for the property condemned, 74.242 per cent of the ultimate total awards and of each award comprising the total, and that from May 11, 1945, to June 3, 1948, there was on deposit and available for distribution 79.09 per cent of the total and of each award comprising the total." This appears to state the correct legal principle; unless some factual error in the computation can be shown, the figures should be taken as the basis for the distribution of interest among the claimants.

The ten opposing parties, or appellees, in these cases now to be reversed fall into

case and manifestly unfair where application for withdrawal is substantially delayed. On our view of the case the point is not here in issue; but we deem it appropriate to say that we do not think the court was laying down any general principle requiring the United States to pay interest before any application for withdrawal was made, even though such an application may ultimately have been granted.

two groups. The first group comprises those such as the City of New York itself where the original awards were made directly against the United States and the awards of interest will necessarily follow the same course. These include, in addition to the City, the appeals involving Anna D. Sagemann; Harry Peichert; Boeckmann and Martin, executors of Anna C. Boeckmann; and City Bank Farmers Trust Co., trustee of William Kornblum, and Alice Kornblum et al., executors of Abraham Kornblum.

The second group comprises those claimants who have awards to be carved out of the main award to the City of New York, as well as additional separate awards directly against the United States, as directed in United States v. City of New York, supra, 2 Cir., 165 F.2d 526, 1 A.L.R. 2d 870. Included herein is the Brooklyn Eastern District Terminal, which, under our decision in Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 152 A.L.R. 296, certiorari denied 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579, is entitled to an award out of the City's portion for the value of rights under an agreement with the City for the operation of a public freight terminal in the area, as well as a separate and smaller award for the cost of improvements alone made directly against the United States. Included also are various leasehold interests which under our decision in 165 F.2d 526 are to be carved out of the City's portion so far as concerns the leasehold interests, while the value of buildings or other improvements is charged directly against the United States. The award of interest, however, should follow essentially the same principles as above stated.

Where the award is thus carved out of the City's portion, the interest to be allowed the claimant of course reduces the amount of interest to be awarded to the City; it has already been held, without appeal by the City, that the City must be charged with 6 per cent interest, and not as it originally contended only the 4 per cent rate paid to its ordinary creditors under statutory authority. See Judge Chase's statement at pages 257, 258 of 176 F.2d. But so far as the interest has not been paid over to the City, it should be paid directly to the claimants, and not, as some of them claim, through the City as conduit. Some claimants apparently have some hope, as indicated in the next paragraph, of holding the City to a higher award; but we are ruling against this, and there is no reason for further complication or delay by circuitous payments. It is time now that the judgment be final and specific; it should provide for as direct payments to the parties entitled as can possibly be made.

The claim just referred to against the City is most clearly presented in the appeal of the Brooklyn Eastern District Terminal. It is also reiterated in the arguments of other claimants. It is based upon the fact that the City has not appealed from the awards of interest made in favor of various claimants whose principal awards come out of the City's portion. Of course the City did not appeal, because its own major position was that such interest generally was due from the United States and so far as concerns these claimants it at most was only a transmitter of interest received from the government and destined for the claimants themselves. Since the reversals we are directing wipe out all basis for these awards, there is no ground for holding the City for interest awards which, as we have stated, we regard as legally improper. Even had there been some legal basis for limiting our reversal the equities call so strongly for a complete reversal of these orders (and any later orders dependent upon them) that we should not have hesitated so to have ordered in any event. In re Barnett, 2 Cir., 124 F.2d 1005, 1009; Washington Gaslight Co. v. Lansden, 172 U.S. 534, 556, 19 S.Ct. 296, 43 L.Ed. 543. The Terminal's appeal relies on this point and also tries to find some contractual basis in the stipulation whereby certain of these amounts were finally settled under agreement with the City, while it also makes claim for full interest on its direct award against the United States. For the reasons already stated, we see no merit

in any of these contentions and its appeal must fail.[5]

The City's own appeal is based upon its contention denied below that from the payment date, June 3, 1948, the interest award to it should in turn bear interest at 6 per cent until the date of payment. This contention appears to fly in the face of the statutory direction for interest at 6 per cent per annum from the date of taking to the date of payment, 40 U.S.C.A. § 258a; in any event it falls with reversal of the award of interest made below. The City's appeal therefore also fails.

■ The only remaining appeal is that of the City from the order directing it to pay interest to the New York Central Railroad. The Railroad at the time of the vesting of title on April 1, 1941, occupied Pier 3 in Wallabout Market under revocable permits from the City of New York; and it was awarded the sum of $2,274.70 for the return of prepaid rents. This was included in our previous mandate, 165 F.2d 526, 530, 531, where we said: "Next are refunds of prepaid rents of two railroads which should be paid by the City, as the Commissioners provided in their supplemental report," and added the direction to the district judge that "he will leave unchanged the awards to the railroads." In carrying out this mandate the district judge awarded interest to the railroad from the City from April 1, 1941, to June 3, 1948, at 6 per cent, amounting to $978.88. The City had the use of this money during all this period for permits lawfully terminated upon the govermental taking and there appears no sound reason why it should not pay interest therefor. Manifestly there is no basis for a claim against

the United States which took title adversely on the vesting date. The action of the district judge is therefore affirmed.

Thus the fundamental issue in all these appeals seems to us a narrow and simple one, actually decided and controlled by the previous action of this court. Yet to bring it before us again required eleven records and their supporting briefs, making a total of thirty-five booklets of assorted sizes with almost endless repetition, such as the formal reprinting in the records (in addition to extensive extracts in all the briefs) of our opinion in the case in 176 F.2d nine different times, and of our opinion in the case in 165 F.2d three different times. The opinions of course are already readily available in every circuit judge's office and should not have been reprinted at all; as to other material a single reprinting would have been adequate. When the interest question was before us earlier, we were then assailed with a like multiplicity of records and briefs, but said nothing as to this profusion, since distribution of blame was difficult and the end of the proceedings seemed near. Since we must surely be now nearer the actual end, we have decided to tolerate once more this unjustified waste of printer's ink and good paper and inconvenience to the court in the substantial hope that it will not happen again.

On the appeals by the United States in the first ten cases, calendar Nos. 94, 95, 109, 110, 111, 127, 128, 129, 130, 131, the orders of the district court are reversed and the cases are remanded for further proceedings as directed in this opinion. On the appeals by the City of New York in No. 94 and the Brooklyn Eastern District Terminal in No.

5. The Terminal is entitled to one correction, however, which the United States recommends and the City does not protest, but which is not extensive enough to offset the overpayment ordered below or require a formal reversal on its appeal. The court restricted the interest which it did allow on this claim to begin on Jan. 25, 1944, the date of its order establishing Terminal's right pursuant to our mandate in Brooklyn Eastern Dist. Terminal v. City of New York, supra, 2 Cir., 139 F.2d 1007, 152 A.L.R.

296, certiorari denied 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579. But the United States is obligated to pay interest on the deficiency in its deposits according to the principles stated above, there is no reason why the City should receive a windfall, and the Terminal, like other claimants, is therefore entitled to whatever interest may be due it from the date of Apr. 1, 1941, until payment to it of its award. The new order to be entered should so provide.

95, no error is found. On the appeal by the City of New York in No. 120, where the New York Central Railroad Company and the United States of America are appellees, the order appealed from is affirmed.