UNITED STATES of America,
Petitioner-Plaintiff-Appellant-
Appellee,

v.

CERTAIN PROPERTY LOCATED IN the
BOROUGH OF MANHATTAN, CITY,
COUNTY AND STATE OF NEW
YORK, and 540 Pearl Street, a Partner-
ship, et al., Defendants,

and

Lafayette Nut Product, Inc., et al., Defend-
ants-Appellants-Appellees,

and

Bill Allen's Restaurant, Inc., et al.,
Defendants-Appellees,

and

Boylan's Tavern, Inc., Defendant-
Appellant.

No. 245, Docket 29042.

United States Court of Appeals
Second Circuit.

Argued Jan. 19, 1965.

Decided April 2, 1965.

See also 306 F.2d 439.

Roger P. Marquis, Washington, D. C. (Ramsey Clark, Asst. Atty. Gen., Harry T. Dolan, Sp. Asst. to the Atty. Gen., Brooklyn, N. Y., Edmund B. Clark, Washington, D. C.), for the United States.

Herbert Monte Levy, New York City (Romano & Schenker, New York City), for Loder Appeal Press, Inc., Sadye G. Krasner and Morris Greenberg d/b/a Standard Tag Co., Jack M. Press, d/b/a Beacon Type Service, Frank L. Palumbo, Joseph L. Minore, Leo P. Marx, Moses Oelbaum, and John K. Walker, d/b/a Johnnie Walker Press.

Bernard L. Bermant, New York City (Skinner & Bermant, Leddy & Raber, New York City; Carl J. Moskowitz, New York City, of counsel), for Il Progresso Italo-Americano Publishing Co., Inc., Pearl Street Restaurant, Inc., Boylan's Tavern, Inc., and Universal Brush Corp.

Joseph Z. Goldstein, New York City (Nathan L. and Joseph Z. Goldstein, New York City; Harvey Tropp, New York City, of counsel), for Lafayette Nut Product, Inc. (Chock-Full O'Nuts Corp.).

Arthur D. Goldstein, New York City (Samuel Goldstein & Sons, Herbert Monte Levy, New York City, of counsel), for Samuel Lakow & Sons, Inc. and District Council No. 37, American Federation of State, County and Municipal Employees.

Herman G. Blumenthal, New York City, submitted brief for Josaldo Restaurant, Inc.

Ira I. Gluckstein, New York City, submitted brief for Royal Office Supply Corp. and Consolidated Loose Leaf, Inc.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge:

Hearings conducted by Judge Dimock in the District Court for the Southern District of New York pursuant to our

decision after a trial before Judge Knox, 306 F.2d 439 (2 Cir. 1962), have resulted in an additional award of $3,276. to Il Progresso Italo-Americano Publishing Co., a fee owner, and of awards of $119,-647.46 to eighteen tenants for fixtures constituting real property belonging to them. The United States appeals from all the awards. Il Progresso and four tenants, Pearl St. Restaurant, Inc., Lafayette Nut Product, Inc. Loder Appeal Press, Inc. and Standard Tag Co., appeal from awards that they consider inadequate; Boylan's Tavern, Inc., a tenant which was denied any award, likewise appeals; the other fourteen tenants are satisfied. We affirm on the United States' appeal, direct an award to Boylan's Tavern, and modify and affirm on the appeals of Il Progresso, Pearl St. Restaurant and Lafayette Nut Product, Inc., and affirm on the appeals of Loder Appeal Press, Inc. and Standard Tag Co.

## I. *The Government's Appeal*

Most of the points raised by the United States were argued, both initially and on petition for rehearing, on the former appeal, before a panel consisting of Chief Judge Lumbard, Judge Kaufman and the writer. We could rest on our previous opinion both because it is the law of the case, see Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), and because we are satisfied with it. But the vigor of the Government's attack, its apparent inability to understand what we decided, and the importance of the issues prompt us to make another attempt to specify our points of agreement and disagreement with its position.

■ (1) The Government insists that it is under no obligation to pay for trade fixtures at all. Its first proposition is that in condemnation it need pay only for what it has "taken," regardless of what other losses the taking may cause. Harsh as the proposition sounds, and whatever qualifications it may require, see United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165 (1911); United States v. General Motors Corp.,

323 U.S. 373, 382–384, 65 S.Ct. 357, 89 L.Ed. 311 (1945); United States v. Petty Motor Co., 327 U.S. 372, 379, 66 S.Ct. 596, 90 L.Ed. 729 (1946); Kimball Laundry Co. v. United States, 338 U.S. 1, 14–15, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), we accept it for the purposes of this case. United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). Next, says the Government, the question what the United States takes when it files a declaration of taking of real property is a question as to which federal courts *may* make an independent determination, free from any requirement, Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to follow state law. We fully agree. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Where we break off from the Government is at its third proposition—that the interest in nationwide uniformity of federal condemnation makes it imperative for federal courts to *use* this freedom to ignore state property law in determining what the United States takes when it takes "real estate."

■■ Our disagreement rests both on reason and on authority. The Clearfield opinion itself noted, "In our choice of the applicable federal rule we have occasionally selected state law." 318 U.S. at 367, 63 S.Ct. at 575. When there is no substantial evidence of Congressional intent, the decision of a federal court whether to fashion a set of distinctively federal principles or to follow state rules must turn, in large measure, on the relative importance of nationwide uniformity and of uniform treatment of similarly situated persons in the same state. See Professor Mishkin's perceptive article, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decisions, 105 U.Pa.L.Rev. 797, 810–32 (1957). Here the convenience to federal takers and Government lawyers in having the same writ run on both sides of the Hudson is of slight significance as compared to the need for New York business men planning to invest in trade fixtures

to know that what is real property on Broadway if the city or state condemns it, will be no less real property if taken instead by the federal government. Apart from other considerations mentioned in our previous opinion, 306 F.2d at 444, it would be shocking if tenants, who had invested sums, large in their eyes, in trade fixtures, under leases which, as their lawyers would properly advise, entitled them to compensation on a taking of real estate by the City or State of New York should find themselves wholly uncompensated in a federal condemnation; a tenant's reasonable expectation that he will realize the value of such fixtures, either through use during the term of his lease or through an award in the event of a premature termination by eminent domain, ought not be defeated in this rather rare event. It is not a sufficient answer that leases could contain special provisions whereby landlords would assign portions of their awards in the contingency of a federal condemnation. Small business men such as the claimants here do not consult condemnation specialists when they make leases, and ought not have to do so. Compare United States v. Brosnan, 363 U.S. 237, 242, 80 S.Ct. 1108, 4 L.Ed.2d 1192 (1960). Moreover, as will be seen, on the Government's view the effect of such a provision would be to require the fixtures to be paid for, in largest part, not by it but by the fee owner.

In our previous opinion we cited decisions of three other circuits as holding that a federal court will normally apply state concepts of real property in determining what comes within a federal taking. United States v. Becktold Co., 129 F.2d 473 (8 Cir. 1942); United States v. 19.86 Acres of Land, 141 F.2d 344, 151 A.L.R. 1423 (7 Cir. 1944); Carmichall v. United States, 273 F.2d 392 (5 Cir. 1960). The authority of these cases is in no way vitiated by later ones in two of these circuits, State of Nebraska v. United States, 164 F.2d 866 (8 Cir. 1947), cert. denied, 334 U.S. 815, 68 S.Ct. 1070, 92 L.Ed. 1745 (1948), and United States v. Certain Interests in Property in Cham-

paign County, 271 F.2d 379 (7 Cir. 1959), cert. denied, 362 U.S. 974, 80 S.Ct. 1058, 4 L.Ed.2d 1010 (1960). The Nebraska case rejected a contention that in condemning land leased for the support of schools, the United States must pay the full value of an unencumbered fee in addition to that of the leaseholds; the Champaign case upheld the right of the United States to condemn a leasehold subject to a mortgage rather than free from it, when doing the latter would give the lessee a windfall in the shape of the difference between the 6% interest paid by the Government from the date of the taking and the 4% payable to the mortgagee. In both instances, peculiarities of state law would have produced indefensible windfalls. As the court said in the Nebraska case, "the term 'property' * * * normally will be given the same content as in state law * * * This does not mean, however, that every local idiosyncrasy or artificiality in a state's concepts, or the incidents thereof, necessarily will be accepted." 164 F.2d at 868. The New York rule, which we discuss shortly, can hardly be so classified. Bumpus v. United States, 325 F.2d 264 (10 Cir. 1963), and United States v. Pinson, 331 F.2d 759 (5 Cir. 1964), may be somewhat more helpful to the Government, but apparently in neither case did the parties urge relevant state decisions upon the court, being content to have the issue settled on general principles.

Moreover, in pressing its argument in favor of "federal" law, the Government assumes much too readily that we would not independently arrive at New York's rule that fixtures that cannot be removed without loss of all or most of their value are included in a taking of the real estate. The rule is manifestly a fair one, it carries the authority of a great New York judge, Jackson v. State, 213 N.Y. 34, 106 N.E. 758, L.R.A.1915D, 492 (1914) (Cardozo, J.), and it was noted with approval by the Supreme Court in United States v. General Motors Corp., supra, 323 U.S. at 384, 65 S.Ct. 357.

The Government's claim that the New York rule as to fixtures is really

one giving damages for a loss rather than an award for a taking, forgets that the "damage" rubric is usually applied to payment for elements that are speculative or are carried away by the owner when he leaves or are incapable of transfer to anyone, see Kimball Laundry Co. v. United States, supra, 338 U.S. at 5, 12, 69 S.Ct. 1434 (1949). Very likely the Government's protest reflects its understanding that on a fair method of valuation—a point discussed infra—it will be paying a price for installed equipment that it cannot fully recoup when it tears the building down and sells the fixtures for scrap. But this is the consequence of the settled rule, usually favorable to the condemnor, that "the question is what has the owner lost, not what has the taker gained," Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), and an award for fixtures no more represents "damages" than one for the building itself.

■ Indeed, on further reflection, we are not at all sure that the issue has not been settled against the Government on a constitutional basis by the Supreme Court's statement in General Motors that "for fixtures and permanent equipment destroyed or depreciated in value by the taking, the respondent is entitled to compensation. An owner's rights in these are no less property within the meaning of the Fifth Amendment than his rights in land and the structures thereon erected." 323 U.S. at 383–384, 65 S.Ct. at 362. On this view, New York law is relevant only because it preserves such equipment as the property of the tenant despite the alteration clause in the leases, a rule of property law which a federal court clearly should follow for reasons already intimated. The Government would distinguish General Motors on the basis that there it was condemning a temporary interest in a leasehold; but, as we read the opinion, that distinction concerns the unusual allowance for moving expenses, 323 U.S. at 381–383, 65 S.Ct. 357, not the award of compensation for fixtures, whose value the Government destroys as much by taking the fee as by taking a right to possession.

■ (2) The Government next says that if fixtures of the sort here at issue are included in the taking, the basis of compensation is a matter of federal law. Here also we readily agree. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943).

■ The Government continues that the only method of valuation tolerated by federal condemnation law, even in the case of a building leased to many tenants, is to determine the market value of the building as a unit, and then either to allow for the fixtures taken from the tenants only the amount by which the fixtures were demonstrated to have "enhanced" the market value of the building or to carve any larger allowance out of this total sum. Acceptance of this argument would indeed keep the word of promise to the ear and break it to the hope. In most cases, the first alternative would effectively deny any significant compensation for the fixtures, whereas the second would cause payment to be made not by the taker but by another whose property has been taken. At least this would be so if we adopted the Government's position that the fees are to be valued on the basis of capitalization of existing rentals or of sales of other properties in which the tenants owned the fixtures.

What the Government seeks is to translate a formula which produces fair results in many cases into a categorical imperative that must be applied regardless of consequences. See 1 Orgel, Valuation Under Eminent Domain §§ 109–10, at 464, 466–69 (2 ed. 1953). When the existing use of an equipped building, occupied by its owner, would be its "highest and most profitable use," Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934), and a market value for that use has been established, it is entirely right to say that an additional award for the equipment would

mean double payment.[1] But equipment owned by the many tenants of a loft building[2] does not normally give the building a sale value greater than it would have if devoid of such equipment. Such buildings are sold either to prospective users or to investors looking to rental income and to possible appreciation of the land. The prospective user will pay little more for a building equipped by many tenants; since his objective will be to eliminate the tenants and presumably he will have to pay them whatever salvage value their equipment has, he would probably prefer the building empty. The investor will look primarily to the existing rentals, and these are lower by the very fact that the tenant and not the landlord has made the improvements, and is entitled to remove them.

It would be possibly to satisfy the Government's desire for a "unit" valuation of a loft or other leased building, in a manner consistent with the Fifth Amendment, by reconstructing the rentals at what they would have been if the landlord had supplied the equipment and then applying the suitable capitalization rate to the rentals as so readjusted; if this were done, each tenant could be required to share in the total to the extent of the capitalized value of the added rent determined with respect to him. But we see no reason why courts should be required to proceed in so cumbersome and circuitous a manner in order to arrive at a result that can be more directly reached. In Marraro v. State, 12 N.Y.2d 285, 239 N.Y.S.2d 105, 189 N.E.2d 606 (1963), the New York Court of Appeals faced the issue whether, in cases like these, "the whole real property is to be evaluated with the fixtures included, followed by findings of the extent to which the value of the whole is enhanced by the fixtures of each tenant separately who are to be compensated for their fixtures by sharing pro rata in the total award, or whether the real estate is to be appraised minus enhancement due to these tenants' fixtures, with the fixtures belonging to each tenant to be evaluated separately," 12 N.Y.2d at 293, 239 N.Y.S.2d at 110, 189 N.E.2d at 610. It chose the latter course, following earlier New York decisions and also relying in no small measure on Judge Learned Hand's statement in United States v. City of New York, 165 F.2d 526, 528, 1 A.L.R.2d 870 (2 Cir. 1948):

> "Indeed, we think that it is an undue simplification to extract from the books any 'Unit Rule' whatever, in the sense of general authoritative directions. What has happened, so far as we can see, is that, as different situations have arisen, the courts have dealt with them as the specific facts demanded."

That we are not bound by this New York ruling does not mean that, in the absence of some authoritatively determined federal rule to the contrary, we must ignore a pronouncement of an admired court having much experience with condemnation.

The Government says there is such a contrary rule but we cannot find evidence of it. Judge Learned Hand knew of none in 1948, as apparently the Supreme Court had not when Mr. Justice Roberts wrote the General Motors opin-

---

1. This principle is an important basis for the decisions relied on by the Government that in the condemnation of timber or mineral lands, the entire fee will first be valued, and the shares of persons having timber or mineral rights will be carved out of the award. Meadows v. United States, 144 F.2d 751 (4 Cir. 1944); Eagle Lake Improvement Co. v. United States, 160 F.2d 182, 184 & n. 1 (5 Cir.), cert. denied Humble Oil & Refining Co. v. United States, 332 U.S. 762, 68 S.Ct. 64, 92 L.Ed. 347 (1947).

The same principle may apply when a tenant seeks compensation for the value of an advantageous lease which reduces the value of the reversion. See United States v. City of New York, 186 F.2d 418, 424 (2 Cir. 1951).

2. Fourteen of the 20 damage parcels, including six of the seven damage parcels occupied by the tenants against whose awards the Government appeals, were improved with loft buildings; the other was a two-story retail store building with offices above.

ion in 1945, allowing the value of fixtures as an item additional to what the condemnee, there a lessee, could obtain for renting the property without them. We also find none in the two decisions from other circuits most sharply pressed upon us. In United States v. 425,031 Square Feet of Land, Jersey City, New Jersey, 187 F.2d 798, 800 (3 Cir. 1951), tenants whose leaseholds were condemned had offered testimony both "as to the value of the leasehold without fixtures, and the value of the leasehold as enhanced by the fixtures," and the court had charged the jury to consider the enhancement in determining the fair value of the leasehold. Since the tenants had sought and obtained consideration of the value of the equipment in that manner, a further award for its sound value would indeed have been duplicative. United States v. 1.357 Acres of Land, 308 F.2d 200 (7 Cir. 1962), was a distribution case in which a lessee sought part of an award already made to the lessor. The court held that under the provisions of the particular lease, construed in accordance with Illinois law, the tenant had bargained away any claim for compensation for loss of the leasehold, as in United States v. Petty Motor Co., supra, 327 U.S. at 376, 66 S.Ct. 596; having chosen not to remove the trade fixtures, the only right reserved to the tenant but one of no value on the facts, the tenant had no further claim against anyone. Indeed, under the lease the fixtures not removed expressly became the property of the landlord. We are here dealing with New York leases under which the tenants retained full ownership of the fixtures and waived no claims to compensation for

their taking. See 306 F.2d at 449–451. The "federal rule" is that the United States should not pay twice for such fixtures—not that it should not pay once.

■ (3) The Government's final point is that, at the hearing before Judge Dimock, it should have been permitted to have its expert witness at the first trial, whose figures Judge Knox had used as a basis and then slightly increased, testify as to the extent to which he had taken the tenants' improvements into account in fixing the value of the fee. We do not believe that the point was open. If the Government has in fact paid the wrong parties for certain of the fixtures and those payments are beyond recall, the Government can blame no one but itself. Precisely because the condemnation proceeding was a unified *in rem* action, it was within the Government's power to see that the aggregate of awards to the owners contained no duplication of claims and did not exceed the value of all the property taken. The tenants never concealed their position that the Government had taken from them property which deserved separate appraisal; if the Government believed that the awards to the landlords might be partially duplicated if the tenants succeeded on their prior appeal to this court, it could have taken a protective appeal. Moreover, the fears of double payment are plainly exaggerated. The tenants' claims originally were disallowed in part because most of the fixtures were not deemed "taken" from anyone, and we remain convinced that, as noted in our first opinion, 306 F.2d at 451, if the tenants' improvements entered into the valuation of the landlords' interest at all, the extent was exceedingly minor.[3]

3. The Government's expert testified at the first trial that he had "included everything relating to the building, such as floors, electric wiring, the plumbing, the ceilings, any partitioning, and excluded furniture, machinery or other equipment which might be removable *or was related to the business being conducted*." The italicized phrase would itself exclude most of the items here in question. Moreover, the witness made it clear that he relied primarily on sales of other loft buildings and on a capitalization of net income, then assigning a portion of the latter sum to what he had independently determined to be the value of the land. For reasons previously outlined in the text, neither of these figures would significantly reflect improvements which tenants had made at their own expense and were free to remove.

## II. *The Claimants' Appeals*

(1) Accepting the bulk of Judge Dimock's careful determinations, as many other tenants have done *in toto*, Pearl Street Restaurant, Inc., Lafayette Nut Product, Inc., and Il Progresso contend that he took too narrow a view of what we characterized as a "middle category" of property "which New York regards as neither being so 'distinctively realty' as to belong to the landlord nor as being removable with such little difficulty or loss in value as to have retained its personal character," 306 F.2d at 453.[4] They say he wrongly eliminated some items as not being removable and others as being too freely so.

The lines marking the boundaries of the "middle category" are anything but bright, and views on cases near the boundaries will necessarily differ. The New York courts, bearing in mind the purpose of the law of fixtures "to protect those who, having an estate less than a fee in the land, had made improvements upon it which, if they could not retain, would be lost to them," In re Mayor etc. of City of New York, 39 App.Div. 589, 594, 57 N.Y.S. 657, 660 (1899), have taken a generous view of what may be removed without injury to the freehold and is excluded from the standard alterations clause, see Matter of City of New York, 192 N.Y. 295, 302, 84 N.E. 1105, 18 L.R.A.,N.S., 423 (1908); Century Holding Co. v. Pathe Exchange, Inc., 200 App.Div. 62, 192 N.Y.S. 380 (1922). We may well have misled Judge Dimock by our statement that "asphalt cemented to the floor by the tenant belongs to the owner," 306 F.2d at 450. This would be true if the asphalt became the only floor or integral with it, but we see no good reason for distinguishing a covering of asphalt tiles, removable without damage to the basic structure, or a false ceiling similarly removable, from the partitions held to belong to the tenant in the Century Holding case. That, as a practical matter, most tenants would not remove all such improvements at the end of their leases, when far more depreciation would have accrued, does not make them less the tenants' property. Appellants say and the Government does not deny that such items were considered to fall in the middle category in the Marraro case.

At the other border the controversy concerns such items as air-conditioning systems, where the judge included ducts and piping but excluded machines and a water tower, and dishwashing equipment, where he included certain hot water plumbing but excluded the sink. Here also New York appears to take an approach consistent with business realities. Although gas ranges and ordinary lighting fixtures are "mere personalty," Madfes v. Beverly Dev. Corp., 251 N.Y. 12, 166 N.E. 787 (1929), see Wahle-Phillips Co. v. Fitzgerald, 225 N.Y. 137, 121 N.E. 763 (1919), the Marraro judgment included such items as a walk-in refrigerator and fruit and vegetable stands. See also Gould v. Springer, 206 N.Y. 641, 99 N.E. 149 (1912) (theatre seats); Diamond v. Art Contracting Co., 147 Misc. 88, 262 N.Y.S. 471 (Sup.Ct.1933) (church pews); Marine Midland Trust Co. v. Ahern, 16 N.Y.S.2d 656 (Sup.Ct.1939) (refrigerating machine).

The Government has not favored us with detailed discussion of the appellants' claims but has contented itself with a general argument, already answered in large part, that their very nature, especially as to items claimed to have been readily removable, shows that we are really sanctioning compensation for damage to the claimants' businesses. This is no more true than was a similar argument as to the "bins and other facilities," see 140 F.2d 873 (7 Cir. 1944), in General Motors, supra, 323 U.S. at 383–384, 65 S.Ct. 357. For reasons explained in Kimball Laundry Co. v. United States,

---

4. As to Il Progresso there is a further question how far items as to whose disallowance it complains had been included in the appraisal of the building, which was found to be worthless.

supra, 338 U.S. at 11–12, 69 S.Ct. 1434 (1949), the claimants must forego compensation for loss of good will or expenses incident to moving to some other location. But, just as "it is intolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of secondhand machinery and in so doing discharge the full measure of its duty," Jackson v. State, supra, 213 N.Y. at 35, 106 N.E. at 758, it would be nearly as intolerable that the Government should foist on tenants a *portion* of machinery which had been specially constructed or purchased for use in the premises taken and will lose a large measure of its value if removed for use elsewhere. In the absence of any helpful observations from the Government as to particular items, we hold that all the property whose exclusion is complained of by Pearl Street Restaurant, Inc., Lafayette Nut Product, Inc., and Il Progresso should be compensated—subject to the principles as to property actually removed stated in our earlier opinion, 306 F.2d at 453.

 (2) The district court denied any award to Boylan's Tavern because of a clause in its lease, which we quote in the margin.[5] Boylan's contends that the issue was not open on remand, and that in any event the clause was not a bar. We agree with both contentions.

On the previous appeal we remanded Boylan's claim, like those of other tenants, for the purpose first of determining what property of the tenant fell in the "middle category" and then of evaluating such property. No other issues were left open to the district court. In re Potts, 166 U.S. 263, 17 S.Ct. 520, 41 L. Ed. 994 (1897). Although this alone would suffice, there is the makeweight

that Boylan's brief on the previous appeal apprised the Government of the clause now contended to defeat the claim and argued that it did not have that effect. In the absence of any counter-argument from the Government, we treated Boylan's as standing on the same footing as other tenants. Even if we were wrong in so ruling, we perceive no reason for permitting the Government to raise on remand a point which it had full opportunity to litigate on a prior trial and appeal. The expense of litigation is too great and judicial time is too limited to permit such piecemeal litigation on the part of a litigant well able to protect itself. Cf. Bowling v. United States, 299 F. 438 (8 Cir. 1924).

Moreover, assuming the issue to be open, we think our prior treatment of Boylan's on the same basis as other tenants was right. Noting that a clause "very similar" to that in Boylan's lease had not been deemed a bar in Matter of City of New York (Allen St.), 256 N.Y. 236, 243, 176 N.E. 377 (1931), the district court thought the instant clause demanded a result different from Allen Street and also from Gristede Bros. v. State, 11 A.D.2d 580, 200 N.Y.S.2d 755 (1960), because of the more comprehensive words "any claim which it would have had to an award of damages in the absence of this provision of this lease." Despite the difference in language we do not read paragraph 39 as transferring the tenant's direct claim against a condemnor for the taking of his own fixtures. Its purpose was to enable the landlord to assert his own claims free from any contention by a tenant or a condemnor that he was not entitled to the full award for the taking of the fee unencumbered by a leasehold; for example, if the lease were highly advantageous to the tenant,

5. "Condemnation Clause.
"39. If the whole or any part of the demised premises shall be acquired or condemned by eminent domain for any public or quasi public use or purpose, the Tenant shall have no claim against the Landlord or against any award made

in any such proceeding by virtue of which the premises are so acquired or condemned and the Tenant does by this instrument assign and set over to the Landlord any claim which it would have had to an award of damages in the absence of this provision of this lease."

then but for the clause the tenant would receive an appropriate award from the Government and compensation for the landlord's reversion would be accordingly diminished. However, the clause does not sign over the tenant's trade fixtures or limit his right to remove them; and since the landlord's award should thus not reflect these fixtures at all, there would be no purpose in reading the clause so as to deprive the tenant of the compensation for these items taken from him. United States v. 1.357 Acres of Land, supra, 308 F.2d at 203, does not control because state law fixes the meaning of such lease clauses, and we follow New York's Allen St. decision; but it is worth noting that in the former case, the lease did make some provision for vesting fixture ownership in the landlord and, at the same time, the total award seems not to have reflected the fixtures at all.

Judge Dimock helpfully listed the items that he thought would qualify if we disagreed with his view that Boylan's could not receive an award, as well as two which he thought could not. Consistently with our ruling as to other tenants, we think all these items should be included.

(3) In our previous opinion we ruled that the measure of the value of the tenants' fixtures and the items compensable to Il Progresso was "what a purchaser would pay for them"—but for the condemnation—for use in the premises being "condemned," and that since sales of this sort are rare, depreciated reproduction cost should be considered "as some indication of what a hypothetical purchaser would pay." 306 F.2d at 448, 453. We held this not because it is the rule of New York condemnation law, as it has now been authoritatively declared to be, Marraro v. State, supra, 12 N.Y.2d at 291, 297, 239 N.Y.S.2d at 108, 113–114, 189 N.E.2d 606, but because it is the fair rule, employed by federal courts as well. United States v. Becktold Co., supra, 129 F.2d at 477–478. Contrary to the Government's argument,

"market value" is not always a synonym for "just compensation." As explained in Kimball Laundry Co. v. United States, supra, 338 U.S. at 6, 69 S.Ct. at 1438:

"If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference. But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights."

Apart from Boylan's and one other appellant, which does not press this point, Judge Dimock accepted the testimony of appellants' experts as to reproduction cost but not as to depreciation. The witness for Pearl Street Restaurant, Inc. deducted 15% for observed depreciation, which the judge rejected as fanciful since much of the equipment had been installed in 1925 and 1934. He also rejected the claim of Lafayette Nut Product, Inc. that practically no physical depreciation had occurred in 13 years and its figure of 20% representing the discount a supplier would take if new equipment were returned unused. As to Il Progresso, the judge accepted the expert's varying rates on machinery, where installation dates were discoverable, and on certain long-lasting power wiring; but he thought the rates on non-machine items, averaging 22.7%, too low because the articles were generally old enough that the purchase dates could not be recollected. In Boylan's case, the expert's reproduction figure of $18,322 less 15% observed depreciation was disregarded in part because it conflicted too seriously with the figure of $3,000 for which Boylan's had bought the appraised equipment, and some items not taken, from a predecessor in 1958. The judge felt this discrepancy

tainted equally the expert's total figure for separately valued air conditioning equipment bought in 1959.

The Government made no effort to assist the judge by introducing expert testimony on its own behalf. It contented itself with cross-examining the claimants' witnesses and introducing the claimants' income tax returns, which showed higher depreciation rates than those asserted. The returns, while doubtless admissible, were in no way conclusive. The rate at which an owner endeavors to recover the cost of his capital as a tax deduction does not determine the value of the property at any given date, and the cases which the Government cites, Redman v. United States, 136 F.2d 203 (4 Cir. 1943), and Murdock v. United States, 160 F.2d 358, 362 (8 Cir. 1947), dealt with property assessments rather than income tax returns.

Faced with the dilemma that he could not conscientiously accept the claimants' depreciation estimates and that the Government had failed to provide him with a satisfactory substitute, Judge Dimock was forced to strike out on his own. Save where better evidence was available, he generally attributed a 20-year life to trade fixtures, apparently relying to some extent on an official tax manual in evidence. Perhaps more debatably, he fixed the average age of the fixtures at one-half the period the business had been conducted on the premises and postulated straight-line depreciation. These presumptions were applied to Pearl Street Restaurant, Inc., whose 35-year existence translated into average life of 17.5 years and 87.5% depreciation. A similar method was applied to Standard Tag and, with a minor variation, to Loder Appeal Press. For Lafayette Nut Product, Inc., evidence indicated 1947 as the average installation date and because the equipment was apparently of high quality and very well maintained, a 30-year life was allowed, setting depreciation by 1960 at 43⅓%. As to Il Progresso, he accepted the expert's estimate as to the power wiring and fixed 50% as the extent of depreciation on the remaining items; this latter figure was based on evidence of steady repair and renewal, the 80-year existence of the plant, and the judge's inference that "the process of renewing these twenty-year lived articles must have reached an equilibrium during that long period so that the average age * * * was ten years" and the articles half-depreciated. In his estimate of what should be awarded Boylan's if we disagreed with his legal conclusion that no award should be made, he rejected the expert's starting figure of $18,332 and used instead the sum of $3,000 for which Boylan's had bought the appraised equipment and some unincluded items. For separately valued air-conditioning equipment, he reduced the expert's figure by 84%, a figure which he believed to represent the expert's error as to the prior items. He did not reduce the $3,000 for depreciation but did borrow the expert's general 15% observed-depreciation figure for the air-conditioning apparatus.

The claimants attack the judge's rejection of what they urge to be the only proper evidence of depreciation in the record; pointing to the expense and delay already suffered in undergoing two trials and appeals to recover relatively modest amounts, they ask us to direct entry of a judgment in accordance with their experts' testimony that will avoid another round in this circuit. But although the judge's deductions may have been higher in some instances than we might have made as triers of the facts, we would not ourselves accept the claimants' relatively small depreciation deductions. The insufficiency of most "visual" estimates of depreciation to measure even structural deterioration has been often noted, In re United States Commission to Appraise Washington Market Co. Property, 54 App.D.C. 129, 295 F. 950, 957, cert. dismissed, 265 U.S. 598, 44 S.Ct. 634, 68 L.Ed. 1199 (1924). Such estimates are even less adequate in reflecting function-

al depreciation or obsolescence, classically described in Mr. Justice Brandeis' dissent in St. Louis & O'Fallon R. R. Co. v. United States, 279 U.S. 461, 516–534, 49 S.Ct. 384, 73 L.Ed. 798 (1929). Although some of claimants' trade fixtures may not be highly susceptible to depreciation of that sort, others, such as air-conditioning equipment, clearly are. Even without contrary testimony, a trier of the facts is not bound to follow estimates that offend his common sense, Wong Ken Foon v. Brownell, 218 F.2d 444 (9 Cir. 1955). "Proving too much, they fail of the intended effect," Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 175, 54 S.Ct. 658, 668, 78 L.Ed. 1182 (1934).

Moreover, the judge's findings as to value are findings of fact entitled to the benefit of the "unless clearly erroneous rule," F.R.Civ.P. 52(a), where—as here—he applied the proper legal standard. In view of that, of our considerable measure of agreement, and of the fact that depreciated reproduction cost is only "some indication of what a hypothetical purchaser would pay," 306 F.2d at 453, we affirm his valuations, with a single exception relating to Boylan's Tavern. Although we find no fault in the judge's decision to accept the sale price of the purchased fixtures as better evidence than the expert's far larger figure, we think he erred in making a similar reduction as to air-conditioning equipment installed in 1959 with the unit itself. Since the expert's reproduction cost figure for the air-conditioning unit was accepted, and corroborated by testimony of actual cost, and since his reproduction cost figures were accepted as to other claimants, it would seem reasonable to accept his figure for the air-conditioning accessories that were not removed, reducing it only by 5% for a year's depreciation.

We direct that the judgment be modified as herein stated and affirm it as so modified. Judge Dimock's findings and this opinion ought permit judgment to be entered by him without need for further hearings.